PUGET SOUND PLYWOOD, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3933–62.    Filed June 4, 1965.

*Karl D. Loos, Paul P. Ashley*, and *John A. Whitney*, for the petitioner.

*Wilford H. Payne* and *James M. Carter*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income tax against the petitioner for the following years and in the following amounts:

| Calendar year | Deficiency |
|---|---|
| 1958 | $390,113.51 |
| 1959 | 520,936.08 |
| 1960 | 207,538.17 |

The sole issue for decision herein is whether the petitioner, which is a cooperative association of the type commonly known as a workers cooperative association, that was incorporated and operated in accordance with a statute of the State of Washington that pertains particularly to the formation and regulation of associations operating on a cooperative basis: (1) Is entitled to be classified and treated for Federal income tax purposes as a "nonexempt cooperative association," within the meaning of that term as employed in the Federal income tax statutes, the long-established rulings and practice of the Internal Revenue Service, and various judicial decisions; and (2) is entitled as such, to *exclude* from the proceeds of the association's operations, for Fed-

eral income tax purposes, the "patronage dividends" which were, pursuant to a preexisting legal obligation, allocated to the worker-members in proportion to the hours worked by them in producing and marketing the products of their joint efforts.

The only other issue raised in the pleadings is an alternative one which has been settled by the parties through a written stipulation. Effect will be given to this stipulation to the extent that the provisions thereof are pertinent after disposition of the previously stated issue.

### FINDINGS OF FACT

Some of the facts have been stipulated. This stipulation of facts and all exhibits identified therein are incorporated herein by reference; subject however to agreement of the parties that certain words employed therein, such as "shareholder," "member," or "margins," are not conclusive as to the true character of the organization and transactions here involved.

Petitioner was incorporated in 1941 under a statute of the State of Washington (hereinafter cited) that pertains particularly to the formation and regulation of associations operating on a cooperative basis. It filed a Federal income tax return for each of the years involved with the district director of internal revenue at Tacoma, Wash.

*Facts re History and Characteristics of Cooperative Associations*

A "cooperative association" has been defined in Income Tax Regulations, sec. 1.522–1(b) (1), as follows:

The term "cooperative association" includes *any corporation operating on a cooperative basis* and allocating amounts to patrons on the basis of the business done with or for such patrons * * * [with certain exceptions not here relevant.] [Emphasis supplied.]

Another and more detailed definition is this: [1]

A cooperative is an organization established by individuals to provide themselves with goods and services or to produce and dispose of the products of their labor. *The means of production and distribution are those owned in common and the earnings revert to the members, not on the basis of their investment in the enterprise but in proportion to their patronage or personal participation in it.* Cooperatives may be divided roughly into consumer cooperatives and producer cooperatives.

Consumer [cooperative] organizations operate for the benefit of the members in their capacity as individual consumers. * * *

Producer [cooperative] organizations operate for the benefit of the members in their capacity as producers. Their function may be either the marketing or processing of goods produced individually (as in fishermen's or farmers' marketing associations, or associations which make butter or cheese from farm prod-

---

[1] 7 Ency. Amer. 639 (1959 ed.).

ucts received from farmer members), or the marketing of goods processed or produced collectively (as in the so-called workers' [cooperative] productive associations operating factories or mills). [Emphasis supplied.]

The history and characteristics of cooperative associations may be summarized as follows.[2] One of the earliest examples of cooperative associations as they exist today was the Rochdale Cooperative, which was founded in England in 1844 by 28 textile weavers who associated themselves together for the purpose of operating a retail store. The objectives which the members of that association sought to attain were: (1) For themselves to own and manage the store, as distinguished from having it owned and managed by outside equity investors; and then (2) to have their association turn back to the members the excess of the receipts from the store sales over the cost of the goods sold and the expenses of operation. This general form of cooperative organization thereafter spread from England to other nations including the United States, where it has since been utilized not only by consumer cooperatives, but also by producing and marketing cooperatives. Thus in the United States for example, in years immediately preceding and following the War Between the States, various types of cooperative enterprises were organized, including those composed of farmers, dairymen, shoemakers, textile and clothing manufacturers, coopers, and ironworkers.

The worker type of cooperative (which included many of those above mentioned) was intended to provide an alternative to the corporation-for-profit form of organization for conducting manufacturing enterprises. Under the corporation-for-profit form of organization, the profit of the enterprise is vested in outside parties who supply the equity capital which is placed at the risk of the business; who select the management and assume the direction over the enterprise; whose separate corporate entity employs workers that derive only those wages which they are able to obtain through bargaining with the representatives of the equity owners; and which equity owners then receive directly or indirectly the benefit of such net profits as the corporation-for-profit form of organization may produce. Under the cooperative association form of organization, on the other hand, the worker-members of the association supply their own capital at their own risk; select their own management and supply

---

[2] In the instant case, the history and characteristics of cooperative associations were developed extensively in the testimony of Dr. Edwin G. Nourse. Dr. Nourse was formerly Chairman of the Council of Economic Advisers, established in the Executive Office of the President of the United States under the Employment Act of 1946; and he also was formerly a director, later vice president, and more recently a consultant at the Brookings Institution in Washington, D.C. He is one of the outstanding authorities on the subject of cooperative associations in the United States and foreign countries. Also, additional helpful testimony on this subject was presented by Kelsey Gardner, formerly associated for many years with the Bureau of Cooperative Marketing of the U.S. Department of Agriculture.

their own direction for the enterprise, through worker meetings conducted on a democratic basis; and then themselves receive the fruits of their cooperative endeavors, through allocations of the same among themselves as coowners, in proportion to the amounts of their active participation in the cooperative undertaking.

The founders of the above-mentioned Rochdale Cooperative formulated three guiding principles, which still persist as the core of economic cooperative theory:

(1) Subordination of capital, both as regards control over the cooperative undertaking, and as regards the ownership of the pecuniary benefits arising therefrom; (2) democratic control by the worker-members themselves; and (3) the vesting in and the allocation among the worker-members of all fruits and increases arising from their cooperative endeavor (i.e., the excess of the operating revenues over the costs incurred in generating those revenues), in proportion to the worker-members' active participation in the cooperative endeavor.

Implementation of the first of these three principles, relating to the subordination of capital contributions in determining the right to the pecuniary benefits, is effected through the statutes under which the cooperatives are organized, and also by the charters and bylaws of the cooperatives themselves—all of which contain limitations upon the amounts that may be distributed to members in respect of the stock which represents the necessary capital that the members themselves supply. Indeed in the case of many cooperatives, distributions in respect of the worker-members' stock are forbidden entirely. Also, implementation of the subordination of capital as regards control over the management and direction of the cooperative, is achieved through bylaw provisions which vest in the members themselves the right and power to elect the trustees and the officers of the cooperative.

Implementation of the second of the above principles, relating to democratic control, is effected by having the worker-members themselves periodically assemble in democratically conducted meetings at which each member has one vote and one vote only, and at which no proxy voting is permitted; and these workers there deal personally with all problems affecting the conduct of the cooperative.

And finally, the third of the above-mentioned principles of cooperatives, relating to the proportionate vesting in and allocation among the worker-members of all fruits and increases from their cooperative endeavor, is achieved through statutes, bylaws, and contractual arrangements between the association and its members, whereby the elected officers of the association are required to make periodic allocations of the same among the members in proportion to their active participation as workers.

Cooperatives—including workers cooperatives—are, and have been for many years, authorized by statutes of many of the States. Typical

of these statutes is one which was enacted by the State of Wisconsin in 1911 (Wisc. Laws 1911, ch. 368), which has since provided the pattern for similar statutes of other States, including the statute of the State of Washington here involved.

Thus, the basic and distinguishing feature of a workers cooperative association, as compared with a corporation-for-profit, is that in the case of a workers cooperative association the fruits and increases which the worker-members produce through their joint efforts are *vested in and retained by* the workers themselves, rather than in and by the association, as such, which functions only as an instrumentality for the benefit of the workers; and that these fruits and increases of the cooperative effort are then allocated among the active workers as patronage dividends, in proportion to their participation in producing the same. In the case of the corporation-for-profit, on the other hand, the fruits and increases of such organization belong to the corporate entity itself; and these increases (called net profits) are then either distributed or retained for the benefit of the equity owners, not in proportion to their personal efforts but rather in proportion to the amounts of capital which they supply. And also these same equity owners, acting either directly or indirectly, also select the management and control the functions and policies of their entity—not on a one-person one-vote basis without use of proxies, but rather through multiple voting in proportion to the number of shares of capital stock which they hold.

### Facts re Organization of the Petitioner

In 1913, the legislature of the State of Washington enacted a statute (Wash. Laws 1913, ch. 19) entitled "Co-Operative Associations—An act providing for the formation and carrying on of co-operative associations and providing for the rights, powers, liabilities and duties of the same." Said chapter of the session laws (as amended in respects not here material) is now codified as chapter 23.86 of the Code of Washington.[3] Those provisions of said code which are here material, are as follows:

23.86.010 Cooperative associations—Who may organize. Any number of persons, not less than five, *may associate themselves together as a cooperative association,* society, company or exchange *for the transaction of any lawful business on the cooperative plan.* For the purposes of this chapter the words "association," "company," "exchange," "society" or "union" shall be construed the same.

23.86.020 Business authorized. An association created under this chapter, *being for mutual welfare,* the words "lawful business" shall *extend to every kind*

---

[3] The Revised Code of Washington makes provision, in other chapters and sections thereof, for corporations of several types other than that here involved. See, for example, ch. 23.01—Private Business Corporations Act; ch. 24.04—Nonprofit, Nonstock Corporations; and ch. 24.32—Agricultural Cooperative Associations.

*of lawful effort for business*, agricultural, dairy, mercantile, mining, *manufacturing* or mechanical business, on the cooperative plan.

23.86.080 Trustees. Every such association shall be managed by a board of not less than three trustees. * * * The officers of every such association shall be a president, one or more vice presidents, a secretary and a treasurer who shall be elected annually by the trustees. Each of said officers must be a member of the association. All elections shall be by ballot.

23.86.100 Bylaws. Any association formed under this chapter may pass bylaws to govern itself in the carrying out of the provisions of this chapter which are not inconsistent with the provisions of this chapter.

23.86.110 Stock—Issues—Vote—Limits. * * *

\*            \*            \*            \*            \*            \*            \*

*No stockholder at any meeting shall be entitled to more than one vote.*

23.86.160 Apportionment of earnings. The trustees may apportion the net earnings by paying dividends upon the paid-up capital stock at a rate not exceeding eight percent per annum. They may set aside reasonable reserves out of such net earnings for any association purpose. The trustees may, however, distribute all or any portion of the net earnings to stockholders in proportion to the business of each with the association : * * * All dividends declared or other distributions made under this section may, in the discretion of the trustees, be in the form of capital stock or other capital or equity certificates of the association. * * *

23.86.170 Distribution of dividends. The profits or net earnings of such association shall be distributed to those entitled thereto at such time and in such manner not inconsistent with this chapter as its bylaws shall prescribe, which shall be as often as once a year.

[Emphasis supplied.]

At the time when the present petitioner cooperative association was organized in 1941, five individuals executed, under oath, articles of association which provided in material part :

KNOW ALL MEN BY THESE PRESENTS, that we * * * *do hereby associate ourselves together* for the purpose of forming, *and do hereby form a Co-operative Association*, under and by virtue of the laws of the State of Washington, and to that end we do hereby make, certify and subscribe in triplicate the following :

## NAME

The corporate name of the corporation hereby formed shall be "PUGET SOUND PLYWOOD, INC."

### OBJECTS AND PURPOSES

The objects and purposes for which this corporation is formed, are as follows :

(a) To purchase, lease, acquire, construct, erect, own, operate and maintain in Pierce County, Washington, or in any other county of the State of Washington, a plywood mill or mills or any other manufacturing plants for manufacturing and processing of all kinds of wood products, and by-products.

\*            \*            \*            \*            \*            \*            \*

(i) *This corporation is formed under and by virtue of the Chapter 19, 1913 Session Laws of the State of Washington relative to co-operative associations*, and shall have and enjoy all the powers and privileges granted by the laws of

Washington to co-operative associations. The capital stock shall be $2,850,000.00 divided into 2,850 shares of $1,000.00 each. *No shareholder shall own more than ten shares of stock in the association, nor be entitled to more than one vote.* (Amendment 5/2/49)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### TRUSTEES

The number of Trustees of this Association shall be nine (9) elected from the stockholders, \* \* \*
[Emphasis supplied.]

Petitioner's bylaws, as amended and in force and effect throughout the taxable years involved, contained the following provisions:

### Section 1

### A COOPERATIVE ASSOCIATION

*This association is organized to operate and shall operate on a cooperative, nonprofit basis for the mutual benefit of its members* as producers of wood products and marketing thereof. *Any excess of receipts from the production and marketing of wood products over expenses shall be the property of the members of the association,* the basis of each member's interest therein being as set forth in these by-laws.

### Section 2

### WHO SHALL BE A MEMBER

A member must be elected by a vote of a majority of the Board of Trustees, and shall possess the following qualifications:

(a) *He must be a worker, or potential worker, in or in connection with one of the production facilities of the association.* The right of a member to work shall at all times be recognized, subject to unavoidable conditions causing temporary unemployment. \* \* \*

(b) He must be a shareholder in the association. *Each worker must own the same number of shares in the association* as every other worker, the number of shares to be determined by the Board of Trustees.

### Section 3

### TERMINATION AND TRANSFER OF MEMBERSHIP

(a) *When a member permanently ceases to be a worker* for any reason or sells his shares in the association, *he shall cease to be a member of the association.*

(b) When a membership ceases for any reason, the former member, his heirs or personal representatives, shall offer to sell his entire unit of stock to the association, and the association shall have the first option to buy. If this option to buy is not exercised by the Board of Trustees within sixty (60) days, the former member (his heirs or personal representative) is free to dispose of his stock to a potential worker, *the transfer of the shares on the books of the association being contingent on his election to membership by the Board of Trustees.*

## Section 4

### MEETINGS OF MEMBERS

\*     \*     \*     \*     \*     \*     \*

(g) *Each shareholder shall be entitled to cast one vote* upon any question coming before a meeting.

\*     \*     \*     \*     \*     \*     \*

## Section 6

### MISCONDUCT

Should any member be discharged for refusing to obey orders, or for drunkenness or disorderly conduct, he shall have the right, within forty-eight (48) hours thereafter, to place the matter as he chooses before the Board of Trustees by reducing his claims to writing and leaving the same with the secretary of the association. The board shall act promptly on such matters, and if the member has been unjustly discharged he shall be reinstated without loss of time. Should such member fail, within forty-eight (48) hours, to place his contentions before the Board of Trustees, he shall forfeit his right to a hearing.

\*     \*     \*     \*     \*     \*     \*

## Section 8

### TRUSTEES

\*     \*     \*     \*     \*     \*     \*

(f) The compensation for trustees shall not exceed $5.00 per month unless authorized by the members at a regular or special meeting. There shall be no compensation for officers as such unless authorized in writing by the Board of Trustees.

\*     \*     \*     \*     \*     \*     \*

## Section 11

### COMPENSATION OF MEMBERS

Members shall be entitled to compensation for work performed for the association. Their compensation shall be fixed from time to time by the Board of Trustees. The *rate of compensation so fixed shall be uniform among the members.* Rate of compensation shall comply with all state and federal laws and shall be subject to such withholding as may be required by law. *Each working member shall sign a membership agreement consistent with these by-laws.*

## Section 12

### EMPLOYMENT AND COMPENSATION OF NON-MEMBERS

In all instances where a member is qualified to perform particular work for the association, he shall have preference in working over a non-member. Where, however, the Board of Trustees is satisfied that it is in the best interest of the association to employ a non-member or non-members in any capacity, the Board may authorize such employment and fix a reasonable rate of compensation which need not be uniform with that paid to members.

## Section 13

### DIVIDENDS ON CAPITAL STOCK

*No dividends shall be paid on the capital stock of the association.*

## Section 14

### DISTRIBUTION OF MARGINS

(a) The margins of the association in each fiscal year and periods thereof shall be determined in accordance with sound principles of accounting.

(b) *All margins arising from the production and marketing of wood products by members shall be refunded to the members in the following manner:*

(i) Such margins shall be determined four times in each fiscal year of the association, as of the 31st day of March, the 30th day of June, the 30th day of September and the 31st day of December. As soon as practicable after the last day of March, June and September in each year, three-fourths of the margins earned during the preceding quarter shall be refunded to the , members. As soon as practicable after the 31st day of December in each year *all margins not theretofore refunded during the fiscal year shall be refunded to the members.*

(ii) *Each member shall be entitled to receive refunds of margins as above provided in proportion to the number of hours worked by him, as a member, for the association,* compared to the total number of hours worked by the members of the association: (1) during the three months period ended March 31, in each fiscal year, (2) during the three months period ended June 30 in each fiscal year, (3) during the three months period ended September 30 in each fiscal year, and (4) during each entire fiscal year ended December 31.

(c) The Board of Trustees shall have the right to determine whether the refunds of margins in or during any fiscal year shall be made in cash or in certificates of indebtedness or partly in cash and partly in certificates of indebtedness. To the extent that refunds are made in certificates of indebtedness, the amounts retained and represented by such certificates shall be such as, in the opinion of the Board of Trustees, are reasonably necessary for the purpose of establishing or adding to reasonable reserves for capital needs; for the purpose of adding new facilities or equipment or adding to or replacing existing facilities or equipment; for the purpose of adding to or replacing working capital; or for the purpose of repaying money borrowed, including that represented by outstanding certificates of indebtedness. *Each member authorizes the Board of Trustees to invest all or any part of the refunds of margins due him in certificates of indebtedness of the association* and agrees to receive them in place of cash refunds of margins.

[Emphasis supplied.]

After the present petitioner had been so organized as a cooperative association, each of the members contributed $1,000, of which $500 was to be paid immediately and the balance was paid over a period of time. They then hired an engineer, and as worker-members they built the association's plywood plant from the ground up. This plant was located in Tacoma, Wash.; and it included a plywood mill,

and an office which was the association's principal place of business. While building the plant, the worker-members received compensation of 90 cents an hour; and at one time a collection of $5 apiece was taken up to buy paint for use in painting the plant.

The principal activity of this cooperative association, at all times material including the years here involved, was the manufacture and sale of plywood and related wood products.

The number of members of the association during the years involved was approximately 270; and of these an average of 260 were regular full-time workers in the association's plant. Typical reasons for a member not working were: (1) Military service; (2) prolonged illness; and (3) departure from Tacoma with expectation of returning.

*Each member was the owner of 10 shares—no more or less—of the association's stock. The holding of such shares entitled the member to one—and only one—vote at any meeting of the association. Ownership of such 10 shares also entitled the owner to work as a member of the association.*

The trustees investigated and passed upon all applicants for membership in the association, including transferees of the association's shares. These trustees required, among other things: (1) That any person applying for membership be less than 45 years of age; (2) that he submit to a physical examination and obtain the physician's report thereon, showing that he was in good health; and (3) that the applicant be competent to hold a job in the association's plant. After the applicant had met these tests, he presented himself to the trustees for questioning; and there he was required to agree that he would acquire his shares of the association in good faith, for membership purposes only; that he would sign the association's membership agreement and observe its bylaws, rules, and regulations; that when called upon to work in the plant, he would accept and be capable of handling satisfactorily the work assigned to him; and that he would comply with the usual conditions of such employment.

No shares were issued or transferred until the applicant for membership in the association had received the approval of the trustees. After receiving such approval, the president of the association and the new member signed a membership agreement which provided in material part, as follows:

(1) *The Association will afford the member employment and refund to him his proportionate share of all margins arising from the production and marketing* of wood products in accordance with its Articles of Incorporation and Amended By-Laws.

(2) The member will cooperate with the other members to the end that by their joint efforts the maximum production and efficiency be attained.
[Emphasis supplied.]

Meetings of the association's worker-members were held at least semiannually in accordance with the bylaws. At these meetings various business and operating problems were discussed and dealt with by majority vote. The average attendance at these meetings during the years here involved was 224, or about 83 percent of the entire membership. The matters there dealt with included such things as election of trustees, capital expenditures, production efficiency, new methods of operation, claims, and purchases of timber.

During the years involved, almost all the workers in the association's plant were members (being about 260 in number). But there also were employed from five to seven nonmembers, who were chiefly young women in clerical positions, and the plant superintendent.

About two-thirds of the logs used by the association in the manufacture of plywood and other wood products, were acquired through purchase of standing timber from the Forestry Service of the U.S. Department of Agriculture; and the balance was acquired from timber-owners or on the open market. The products manufactured by the association were sold to commercial dealers or users of such products.

*Facts re Allocation of Margins among Worker-Members*

Participating payments in respect of the fruits and increases from the worker-members' cooperative efforts were made to the active worker-members on the basis of the number of hours worked by each, as follows:

(1) On about the 20th of each calendar month, a so-called draw check in the uniform amount of $100 was issued to each worker-member. These amounts were in the nature of drawing-account payments to provide the worker-members with current living expenses.

Thereafter, as of the end of each calendar month, a so-called advance check was issued to each worker in an amount representing the hours worked by him during the month multiplied by a *uniform* hourly rate, and less the amount previously distributed to him as a draw check. The said hourly rate was fixed by the trustees in an amount which more or less approximated the average union rate in the area where the association's plant was located. With minor exceptions, hereinafter noted, the payments and distributions received by each worker-member were uniform in relation to the number of hours worked by him, regardless of the character of the services which he contributed to the cooperative endeavor (i.e., regardless of whether he swept the floors of the plant or was in charge of an operating department). The exceptions were: (1) That the trustees received no compensation for their services as such, except a token payment of $1 per year; (2) that the general manager (a worker-member selected

by the trustees) received a differential of $2,500 in 1958 and of approximately $6,000 in 1959 and 1960; and (3) that the officers of the association received no compensation for their services as such, except a token payment of $1 per year.

The amounts represented by the foregoing checks were issued pursuant to section 11 of the bylaws, and they were considered to be advances against the "patronage dividends" thereafter allocated.

(2) At the close of each quarter of a particular calendar year, a patronage dividend check was issued to each worker-member who had participated during that period. For each of the first three quarters, 75 percent of the fruits and increases of the association (called margins) for that quarter, were distributed to the worker-members on the basis of the hours worked by each in that quarter. And then at the end of the year, the total margins for the year were computed and allocated to all worker-members on a pro rata basis according to the hours worked for the full year, less the amounts of the previously mentioned draw checks, advance checks, and patronage dividends which had been distributed for the preceding three quarters of such year.

In the event that the trustees determined, in accordance with section 14(c) of the bylaws, that it was essential to retain portions of the margins for necessary association purposes, then certificates of indebtedness in lieu of cash would be issued to the worker-members for the portions so retained.

The amounts of the aggregate margins for each year that were distributed to the worker-members as patronage dividends, represented the net proceeds realized by the association from the sale of plywood and related wood products, after elimination therefrom of that portion of these proceeds which was attributable to the participation of employed nonmember workers—and less the amounts previously advanced to the worker-members through the above-mentioned draw checks and advance checks.

The petitioner association instructed the worker-members to file, for each year, individual declarations of estimated tax based on the anticipated patronage dividends to be allocated to them for such year, and to pay Federal income taxes on all such patronage dividends which they received, either in cash or in certificates of indebtedness. In accordance with the requirements of section 6044 of the 1954 Code, the amounts of all margins allocated to worker-members as patronage dividends were reported by the association to the Internal Revenue Service on Form 1099.

The nonmember workers who were employed at the plant during any taxable year did not receive any patronage dividends from the margins so allocated; and also any member who did not work during

any particular year likewise did not receive any patronage dividend with respect to margins attributable to such year.

The petitioner association filed a Federal income tax return (Form 1120) for each of the taxable years involved; and it paid tax on the amount of taxable income reported therein. The taxable income so reported was from sources that were not related to any cooperative efforts of the worker-members; and these sources included the following: That portion of the income from mill operations which was attributable to the services of nonmember workers employed at the plant; miscellaneous interest income; small capital gains in 1958 and 1959 only; and other miscellaneous items such as income from the sale of scrap materials, taxable income in respect of fire insurance recoveries, and income from cold-drink machines in the plant. On said Federal income tax returns, the petitioner association excluded from income the amounts of the margins allocated and distributed to its worker-members as patronage dividends.

The Commissioner, in his notice of deficiency herein, disallowed the exclusion of all patronage dividends in respect of margins.

#### FINDINGS OF ULTIMATE FACT

The petitioner association operated in each of the taxable years involved on a cooperative basis for the mutual welfare of its worker-members.

The right to all fruits and increases from the cooperative efforts of the worker-members (represented by its so-called margins) was vested in and retained by the worker-members themselves, and not in and by the association as a separate entity—which association functioned only as an instrumentality through which the worker-members carried on their cooperative endeavors.

Said margins were allocated among the worker-members as patronage dividends, pursuant to a preexisting legal obligation created by the statutes of the State of Washington, the association's bylaws, and the agreements entered into between the association and the workers at the times when these workers became members. Such margins distributed as patronage dividends, arose out of transactions between the cooperative association and its worker-members. And the same were equitably allocated among the worker-members in proportion to the amount of service which each such worker contributed to the total cooperative effort that produced said margins.

#### OPINION

The problem here presented is a novel one, insofar as this Court is concerned. The petitioner, as we have hereinbefore shown, is a workers cooperative association located in the State of Washington, which was formed, incorporated, and operated by the worker-members on a

cooperative basis, for their mutual benefit in producing and marketing plywood and related wood products; and this petitioner, acting in accordance with the cooperative plan and pursuant to a preexisting legal obligation, allocated patronage dividends to its worker-members in proportion to the hours worked by them in their joint endeavor.

The specific question to be here answered is: Whether this petitioner, as so formed and so operated, should be regarded for Federal income tax purposes, as a "nonexempt cooperative association" within the meaning of that term as used in the Federal income tax statutes, in numerous rulings of the Internal Revenue Service, and in various judicial decisions (all hereinafter identified); and thus be entitled to exclude from the income which is taxable to itself (and leave for taxation to the individual worker-members) the patronage dividends which were so allocated during the taxable years involved.

After considering and weighing all the evidence in the light of the relevant authorities, we are convinced that this question should be answered in the affirmative, for the following reasons.

1. Since the year 1926, the Federal income tax statutes have accorded exemption from income taxes to certain cooperative associations composed of farmers, fruitgrowers, and the like—which engage in the marketing of farm products or the buying of farm equipment for both members and nonmembers, and which then turn back to such participants the net proceeds of the cooperative activities. The provision for such tax exemption is presently embodied in section 521 of the 1954 Code. The parties to the present case agree that the instant petitioner does not qualify for exemption under said section.

Notwithstanding this exemption which is accorded a limited type of cooperatives which are able to qualify therefor, the Internal Revenue Service has recognized for many years, in numerous rulings published since at least as early as 1922, that there are many other cooperative associations which, *even though they do not qualify for exemption* under the above statute, are nevertheless entitled (in their capacity as nonexempt cooperative associations) to exclude from their gross incomes, patronage dividends that are equitably allocated to their participating members pursuant to preexisting legal obligations. Several examples of these administrative rulings, which recognized the right of nonexempt cooperatives to exclude patronage dividends, are: I.T. 1499, I-2 C.B. 189, 191 (1922); A.R.R. 6967, III-1 C.B. 287 (1924); S.M. 2595, III-2 C.B. 238 (1924); G.C.M. 12393, XIX-2 C.B. 398 (1933); G.C.M. 17895, 1937-1 C.B. 56; I.T. 3208, 1938-2 C.B. 127; Rev. Rul. 57-59, 1957-1 C.B. 24.

This same principle that nonexempt cooperatives are entitled to exclude true patronage dividends from their gross incomes has also been recognized by the courts in several reported decisions. See, for

example, *Pomeroy Cooperative Co.*, 31 T.C. 674, affirmed on this point 288 F. 2d 326 (C.A. 8); *Smith & Wiggins Gin, Inc.* v *Commissioner*, 341 F. 2d 341 (C.A. 5), affirming 37 T.C. 861; *United States* v. *Mississippi Chemical Co.*, 326 F. 2d 569 (C.A. 5); *Clover Farm Stores Corporation*, 17 T.C. 1265, 1277; *Dr. P. Phillips Cooperative*, 17 T.C. 1002, 1010; *United Cooperatives, Inc.*, 4 T.C. 93, 106; *Midland Cooperative Wholesale*, 44 B.T.A. 824, 830; *Fruit Growers Supply Co.*, 21 B.T.A. 315, 326, affd. 56 F. 2d 90 (C.A. 9); and *Farmers Cooperative Co.* v. *Birmingham*, 86 F. Supp. 201 (N.D. Iowa). In the case of *Dr. P. Phillips Cooperative, supra,* this Court said:

Although the Commissioner has held that the petitioner is not exempt under section 101 (12) [the predecessor of section 521 of the 1954 Code], nevertheless he has allowed the petitioner as a cooperative to exclude from income for tax purposes the amounts which it has distributed in cash as patronage dividends. There is no express statutory authority for this action but for many years the practice has been followed by the Treasury Department and it has received judicial sanction. The theory is that the cooperative is merely a conduit for the patronage dividends * * *.

Also in *Harbor Plywood Corporation*, 14 T.C. 158, 161, this Court stated:

The reason for this rule is that the patronage dividends or rebates are at all times the property of the member stockholders, and nonmembers, and that the selling association is an agent or trustee or mere conduit for the income.

The mere fact that the cooperative may have been organized as a corporation under local law, is not significant as regards its right to exclude patronage dividends. Indeed, most cooperatives are incorporated and regulated under the laws of some State; and all the above-cited judicial decisions in which the right to exclude patronage dividends was recognized, involved incorporated cooperatives; and at least one of them (United Cooperatives, Inc.) was incorporated under the general corporation statute of Indiana.

Also, the particular name by which a cooperative's distributions are designated (such as "patronage dividends," "refunds," or "rebates") is not in our opinion determinative of the cooperative's right to exclude the same. Dr. Nourse (the expert witness above mentioned) pointed out during the course of his testimony that the term "patronage" originated with the above-described Rochdale Cooperative that was founded in England in 1844 and operated a retail store—and in that cooperative endeavor, the participants were of course *patrons*. He further pointed out that the designation "dividends" had its origin in the fact that most distributions out of corporations are called dividends (even though they may not constitute distributions from the corporation's profits—as for example, so-called dividends on mutual life insurance policies). Dr. Nourse suggested that the more accurate

designation for amounts allocated by cooperative associations is "participating distributions."

2. In 1951 the Federal tax statutes, for the first time, gave express recognition to the principle that both exempt cooperative associations and also nonexempt cooperative associations are entitled to exclude true patronage dividends from their gross incomes. In that year, Congress, in section 314 of the Revenue Act of 1951, amended section 101(12) of the 1939 Code by inserting a provision relating to the exclusion of patronage dividends by *exempt* cooperatives; and in this provision, it was stated that such patronage dividends "shall be taken into account in computing net income *in the same manner as in the case of a cooperative organization not exempt.*" (Emphasis supplied.) And thereafter, this same language was carried forward into section 522 of the 1954 Code, as it existed throughout all the taxable years here involved.

In 1962, President Kennedy brought to the attention of Congress that the above-mentioned provisions of the 1951 Act had proved inadequate in several respects; and he recommended that supplemental provisions be enacted, *so that the purpose of Congress, which had been intended to be reflected in the 1951 Act, might be achieved.*[4] This resulted in the enactment of subchapter T (secs. 1381–1388) of the 1954 Code; and in these new supplemental provisions, Congress again gave express recognition (in sec. 1381(a)) to the fact that the new and more comprehensive provisions would be applicable, not only to *exempt* cooperatives but also to "any corporation operating on a cooperative basis other than * * * [one] which is exempt."

3. Neither the above-cited Federal statutes nor any published judicial decision relating thereto have restricted to any particular type of cooperatives the basic principle that corporations operating on the cooperative basis are entitled to exclude from their gross incomes true patronage dividends or participating distributions allocated by them.

As heretofore shown, section 1.522–1(b)(1) of the Income Tax Regulations defines a "cooperative association" to be "*any corporation operating on a cooperative basis.*" (Emphasis supplied.) This obviously is sufficiently broad to cover both marketing cooperatives and also producing cooperatives.

Furthermore in 1962, when the Congress had under consideration the matter of making more effective the cooperative provisions of the 1951 Act through enactment of the supplementary provisions which later became subchapter T of the 1954 Code, a question arose as to whether the phrase "business done with or for patrons," which was contained in these new provisions, was sufficiently broad to cover

---

[4] H. Rept. No. 1447, 87th Cong., 2d Sess., 1962–3 C.B. 405, 482–483 ; S. Rept. No. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 707, 817.

*services* done with or for patrons—so as to cover participating distributions of a cooperative association engaged in the manufacture of plywood. In this connection, the following colloquy was had in the Senate between Senator Kerr (floor manager of the bill), Senator Magnuson of Washington, and Senator McCarthy of Minnesota:

Mr. MAGNUSON. Mr. President, I wish to ask the distinguished Senator from Oklahoma [Senator Kerr] a question.

On pages 295 and 296 of the bill, in the definition of the term "patronage dividend," it is stated that a patronage dividend is a payment "determined by reference to the net earnings of the organization from *business done with or for its patrons.*"

In a case which has been called to my attention—*it involves the manufacture of plywood in the Pacific Northwest, and many of the companies are cooperative organizations*—the cooperative renders *services* for the patron. I wanted to be sure that in the opinion of the Senator from Oklahoma the phrase "*business* done with or for its patrons" *includes services* with or for patrons.

Mr. KERR. I think it is clear, *both under the interpretation of a patronage dividend under present law* and also under the words "business done with or for its patrons," that *services* rendered with or for patrons are included. *Business done is not necessarily limited to products sold to or purchased for patrons.* Business done also includes services performed for patrons, as well.

Mr. MAGNUSON. I thank the Senator from Oklahoma.

Mr. McCARTHY. Mr. President, if the Senator will yield, let me say I think this is a *reasonable and desirable interpretation* of the language; and I believe that any other interpretation would create an impossible distinction.

[108 Cong. Rec. 18322. Emphasis supplied.]

4. The most recent development in this field is the decision of the U.S. District Court for the District of Oregon, in the case of *Linnton Plywood Association* v. *United States*, 236 F. Supp. 227 (decided Oct. 30, 1964), on appeal (C.A. 9). That court is located in the heart of the plywood industry; and said decision was written by Chief Judge Solomon of that court. Both the issue there involved and the facts found by the court were substantially the same as those in the instant case. The opinion of the court, which was in favor of the taxpayer, states in material part as follows:

The Government admits that retained patronage dividends are excludable from gross income of non-exempt cooperatives provided they are either purchasing or marketing cooperatives. It insists that the exclusion is not applicable to workers' cooperatives.

Workers' cooperatives are among the oldest forms of cooperatives and exist in many countries of the world. Many people regard a worker's cooperative as the basic type of cooperative. The Government concedes that if the members had individually created the plywood products and then brought them to the cooperative for marketing, the cooperative would be entitled to the exclusion, but claims that since the members collectively manufacture the products as well as market them, the cooperative is not entitled to the exclusion. I think that this is an illogical and absurd distinction. In my view, [nonexempt] workers' cooperatives are entitled to exclude retained patronage dividends from gross income to the same extent as purchasing or marketing cooperatives.

To avail itself of the exclusion, a cooperative must satisfy three requirements, (1) The allocation must be made pursuant to a legal obligation existing when the patron transacted business with the cooperative. (2) The allocation must be made out of profits or income realized from transactions with its patrons. (3) The allocations must have been equitably made. United States v. Mississippi Chemical Co., 326 F. 2d 569, 573–574 (5th Cir. 1964) ; Pomeroy Cooperative Grain Co. v. Commissioner, 288 F. 2d 326, 328 (8th Cir. 1961). Plaintiff has met all these requirements.

We agree with the views expressed by Chief Judge Solomon in the above case. We have found no published court decision to the contrary.

5. The Internal Revenue Service in 1961, which was subsequent to the taxable years here involved, issued a ruling (Rev. Rul. 61–47, 1961– 1 C.B. 193) to the effect that amounts distributed by a nonexempt cooperative association to its worker-members, are not patronage dividends excludable from such cooperative's gross income. Such ruling is in direct conflict with the above-mentioned decision of the Oregon District Court in the *Linnton Plywood* case; is unsupported by citation of any statutory provision or judicial authority; and is out of harmony with the basic distinguishing principles of cooperative organizations generally. In our opinion, the ruling is erroneous.

In the instant case, we have found as an ultimate fact that the petitioner association was organized and operated on a cooperative basis by the worker-members, who joined together for their mutual benefit in not only marketing their products cooperatively, but also in producing them cooperatively. If, as suggested in the *Linnton Plywood* case, these worker-members had manufactured wooden products (such as chairs or tables) in their own individual workshops and then had marketed the same through their cooperative association, there could be no dispute that the participating distributions in respect of the marketing function would, when allocated to the members pursuant to a preexisting legal obligation, be excludable from the gross income of the cooperative. Here however, because of the nature of the plywood product, the character of the necessary machinery, and the intricacy of the skills required, the members joined in working under a common roof, rather than in separate workshops, to both produce and market their products cooperatively. We perceive of no warrant in law, fact, or logic why these two methods of cooperative endeavor should not be accorded equal treatment for Federal income tax purposes.

We have hereinbefore found as an ultimate fact, and we here hold, that the right to the fruits and increases of the cooperative efforts of petitioner's worker-members (i.e., margins) was vested in and retained by such workers, and *not* in and by the cooperative association as a separate entity. And we further hold that the amounts of such

margins, which for the taxable years here involved were equitably allocated to the worker-members as patronage dividends pursuant to a preexisting legal obligation, are excludable from the petitioner-association's gross income for Federal income tax purposes.

Reviewed by the Court.

*Decision will be entered for the petitioner.*