118 T.C. No. 8

UNITED STATES TAX COURT

RICHARD J. BOT AND PHYLLIS BOT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14155-98.            Filed February 15, 2002.

Ps maintained active memberships in an agricultural cooperative, which processed and sold corn produced by its members.  As active members, Ps were obligated to produce and deliver corn to the cooperative regularly, and, during 1994 and 1995, they met that obligation with corn they acquired from a "pool" maintained by the cooperative.  The cooperative processed and sold the corn for Ps' benefit and paid to Ps value-added payments for the corn.  For Federal tax purposes, Ps reported the value-added payments they received during 1994 and 1995 as proceeds from the sale of capital assets and did not treat the amounts received as self-employment income.

<u>Held</u>:  During 1994 and 1995, Ps were engaged in the business of acquiring and selling corn and corn products for a profit.  The value-added payments were derived from Ps' business and must be included in the calculation of Ps' net earnings from self-employment for purposes of determining Ps' liability for self-employment tax.

Kathryn J. Sedo, for petitioners.

Blaine C. Holiday, for respondent.


MARVEL, Judge:  Respondent determined deficiencies in petitioners' Federal income tax for 1994 and 1995 of $7,239 and $13,716, respectively.

The sole issue for decision is whether petitioners are liable for self-employment tax under section 1401[1] on value-added payments that they received in 1994 and 1995 from an agricultural cooperative of which they were active members.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated in our opinion by this reference.  Petitioners resided in Marshall, Minnesota, when the petition in this case was filed.[2]

During all relevant years, Richard J. Bot (Mr. Bot) and Phyllis Bot (Mrs. Bot) owned and lived on a 700-acre farm in Minnesota.  Before 1988, petitioners ran their farm operation, growing crops such as corn, alfalfa, and soybeans and raising livestock.  In the fall of 1987, however, petitioners decided to

----

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar where appropriate.

[2]Petitioners live in Texas from November to April.

retire from daily farming and entered into a written farm agreement (the 1987 farm agreement) with two of their sons, Richard F. Bot and Bennett Bot (hereinafter referred to as the sons). This agreement was renewed orally each year. The 1987 farm agreement required the sons to operate petitioners' farm "in a good and husband-like manner, and according to the usual course of husbandry" and required petitioners to compensate the sons by paying them with a "one-half part or share of all grains, vegetables, corn, soy beans and other crops so raised and secured upon said farm".

The 1987 farm agreement required petitioners to pay for half of the costs of seed, fertilizer, and weed sprays and to provide land and machinery for the farming operation. The 1987 farm agreement also gave petitioners the option of making major repairs to or replacing equipment, when necessary, but did not require them to do so. The 1987 farm agreement required the sons to pay for half of the costs of seed, fertilizer, and weed sprays; to furnish all labor and pay all operating costs; to haul and deliver crops for petitioners; and to keep petitioners' farm implements in good repair. Under the 1987 farm agreement, petitioners and the sons were supposed to divide all Government program aid equally.

The arrangement between petitioners and the sons during 1994 and 1995 followed the basic parameters of the 1987 farm agreement but was broader. Under the arrangement in effect for 1994 and

1995, petitioners and the sons contributed equally to farm expenses and shared equally in farm profit or loss. During 1994 and 1995, crops grown on the farm were either fed to farm livestock or sold, and any profit generated from the farm operation, including profit from the sale of crops and livestock, was split approximately equally between petitioners and the sons. Petitioners delegated to their sons the authority to decide whether crops raised on the farm were to be fed to livestock or sold on the open market. During 1994 and 1995, the sons sold corn and soybeans in petitioners' names because it was economically advantageous to do so.

Pursuant to the arrangement in effect for 1994 and 1995, petitioners paid part of the farm expenses. In November 1994 and again in November 1995, petitioners estimated the results of the farming operation and wrote checks to the sons to reimburse them for petitioners' share of farm expenses. In November 1994, petitioners paid $25,000 to each son; in November 1995, petitioners paid $35,000 to each son.[3] At the end of the year, petitioners and the sons added up the income earned from the farm operation, subtracted the farm expenses petitioners and the sons

---

[3]Although the memo portion of each personal check written in 1994 states that the check was for "corn purchased", petitioners admitted at trial that they paid the money to reimburse the sons for petitioners' share of expenses incurred in the farming operation.

had paid, and calculated how much of the farm operation's profit they each were entitled to receive.

With the exception of proceeds generated from the sale of corn in 1995 that were reported as proceeds from the sale of capital assets on Schedule D, Capital Gains and Losses, petitioners reported their share of farm income and expenses as farm rental income and expenses on Forms 4835, Farm Rental Income and Expenses, attached to their 1994 and 1995 Forms 1040, U.S. Individual Income Tax Return.

Minnesota Corn Processors

In approximately 1982, a group of Minnesota farmers formed Minnesota Corn Processors (MCP), an agricultural cooperative organized under the laws of Minnesota.[4]  MCP was incorporated to handle all aspects of dealing with agricultural products produced by its members and to perform services for its members.

Under its articles of incorporation, MCP was authorized to issue 30,000 shares of common stock and 100,000 shares of nonvoting preferred stock.  Only "producers of agricultural products * * * who reside in the territory served" by MCP could hold shares.  A producer is any person "actually engaged in the

---

[4]MCP's objective was to accomplish collectively what none of its members could accomplish individually--process corn and realize profits from the increased value of that processed corn. Without MCP's pooled funds and processing facilities, its members would have had to sell their corn, if any, to an elevator.  Then, any value added to the corn by processing the corn would have been realized by others.

production of one or more of the agricultural products handled"
by MCP and includes lessors of land who receive crop shares as
rent.  A member is any producer of agricultural products who is
eligible for membership in MCP and who has acquired a minimum of
5 shares of MCP's common stock.

Under its bylaws in effect during 1994 and 1995, MCP was
authorized to terminate any membership if an existing member was
no longer eligible for membership, a member failed to patronize
MCP for 1 year or more, a member moved from the territory served
by MCP, or died, or ceased to be an agricultural producer, or a
member violated MCP's bylaws, breached a contract with MCP, owed
MCP a delinquent debt, or willfully obstructed MCP's purposes or
activities.  In such an event, MCP's board of directors had the
right, at its option, to purchase the member's stock or to
require the member to convert his common stock to either
preferred stock or a nonvoting certificate of interest.

Petitioners became members of MCP in 1982.  Mr. Bot
purchased 40 shares of common stock on August 26, 1982, and Mrs.
Bot purchased 15 shares on August 28, 1982.  As members,
petitioners were also required to purchase units of equity
participation and to enter into a uniform marketing agreement
(UMA) with respect to each unit.  The units of equity
participation and the UMAs collectively defined the scope of
petitioners' obligation to patronize MCP.  Each unit of equity

participation specified the maximum number of bushels of corn the member could be required to produce and deliver to MCP each processing year,[5] and the related UMA set forth the terms governing the production, processing, and marketing of the corn. During 1994 and 1995, petitioners were active members of MCP who owned MCP common stock. As active members, petitioners continued to have ongoing production obligations to MCP and its membership.

Beginning in 1982 and continuing through and including 1995, petitioners periodically purchased units of equity participation as follows:

| Richard J. Bot | | Phyllis Bot | |
|---|---|---|---|
| Date | Units purchased | Date | Units purchased |
| 8/26/82 | 40,000 | 8/28/82 | 15,000 |
| | | 12/20/85 | 20,000 |
| 2/1/90[1] | 20,000 | 2/1/90 | 17,500 |
| 10/1/90 | 30,000 | 10/1/90 | 26,250 |
| 12/1/91 | 5,000 | 12/1/91 | 20,000 |
| 6/1/92 | 30,000 | 6/1/92 | 26,250 |
| 3/1/94 | 10,000 | 3/1/94 | 10,000 |
| 6/1/94 | 62,500 | 6/1/94 | 62,500 |
| 6/1/95 | 79,000 | 6/1/95 | 79,000 |
| 9/18/95 | 16,500 | 9/18/95 | 12,750 |
| 12/1/95 | 20,000 | 12/1/95 | 20,000 |

[1]Petitioners testified they purchased additional units after 1987 because they thought the units would make good investments.

As MCP members, petitioners were required to produce and deliver corn three times each year as determined by MCP. The timing of the deliveries was also within MCP's discretion.

---

[5]MCP's processing year begins Oct. 1 and ends Sept. 30. MCP's fiscal year begins Jan. 1 and ends Dec. 31.

Petitioners could meet their production and delivery obligations with corn that was grown on their farm, that they acquired elsewhere, or that MCP already held in its option pool.[6] "Option pool corn" is corn maintained by MCP and made available for sale only to MCP members for use in meeting their production and delivery obligations under the UMAs. A member who wished to satisfy his production and delivery obligation using option pool corn completed a form to that effect and paid an acquisition fee of 5 cents per bushel of option pool corn purchased. If either petitioner failed to meet the production and delivery obligations under the UMA, the UMA authorized MCP to act as that petitioner's agent in acquiring corn, charging all related expenses to Mr. Bot or Mrs. Bot, as appropriate.

In 1994 and 1995, petitioners met their production and delivery obligations under their UMAs with option pool corn. In 1994 and 1995, petitioners paid acquisition fees of $18,070 and $16,431, respectively, for the option pool corn used to satisfy their combined production and delivery obligations.

MCP was obligated, pursuant to the UMAs, to process the corn produced by its members each year as dictated by the market and in a manner MCP deemed in the best interest of the cooperative

---

[6]Regardless of how petitioners acquired the corn they delivered to MCP, petitioners warranted to MCP that they were the producers or owners of the corn they delivered to MCP under the UMAs.

and its membership as a whole. MCP also was obligated to market the processed corn at the best rate obtainable on the open market. In the UMAs, petitioners appointed MCP as their agent to market and sell the corn they delivered to satisfy their production and delivery obligations. MCP determined how much corn petitioners had to produce and deliver and had "sole and complete discretion in all phases of the marketing activity".

In return for petitioners' meeting their production and delivery obligations, MCP was obligated under the UMA to pay each petitioner: (1) At least 80 percent of the loan value per bushel of corn delivered by each petitioner; (2) a storage fee and interest in some cases; (3) an additional payment ("value-added payment") for value added to the corn as a result of its processing, and as further compensation for corn delivered by petitioners, if MCP determined that such a payment was warranted after calculating the net proceeds from all of its operations for the processing year and if MCP's lenders approved; and (4) payments from MCP's earnings as patronage dividends in accordance with MCP's bylaws. During 1994 and 1995, petitioners received value-added payments of $132,375 and $207,612, respectively, attributable to the option pool corn they acquired and delivered to MCP.

Petitioners' 1994 and 1995 Tax Returns

Petitioners reported the value-added payments on Schedules D as proceeds from the sale of capital assets. Petitioners subtracted from those proceeds the following amounts, which they claimed represented their adjusted basis for purposes of calculating their capital gain or loss:

| Description | 1994 | 1995 |
|---|---|---|
| Option pool corn fees | $18,070 | $16,431 |
| Payments to sons | 50,000 | 70,000 |
| Total basis claimed | 68,070 | 86,431 |

Petitioners acknowledged during the trial, however, that they had erroneously increased their basis by the payments made to the sons, which had nothing to do with option pool corn purchased from MCP but rather were to reimburse the sons, at least in part, for petitioners' share of farm-related expenses the sons had paid.[7]

With the exception of some corn sale proceeds reported on the Schedules D, petitioners reported their farm income and expenses for 1994 and 1995 as farm rental income and expenses on Forms 4835. On the Forms 4835, petitioners checked the box acknowledging that they actively participated in the operation of

---

[7]Although petitioners conceded at trial that they erroneously increased their basis in the option pool corn they acquired to satisfy their MCP obligations by the amounts paid to the sons for farm expenses, respondent did not move for an increased deficiency in this case.

their farm during 1994 and 1995 although they testified at trial that they had made a mistake in doing so.

Notice of Deficiency

In the notice of deficiency, respondent reduced petitioners' capital gain income for 1994 and 1995 by the reported capital gains of $64,305 and $121,180, respectively, resulting from petitioners' receipt of the value-added payments. Respondent reclassified the capital gain as Schedule C, Profit or Loss From Business, income, treated that income as net earnings from self-employment, and determined that petitioners were liable for self-employment tax on that income. Respondent did not determine that the income petitioners reported as net farm rental income must be included in calculating petitioners' net earnings from self-employment for 1994 and 1995.

OPINION

Self-employment tax is imposed on the "self-employment income" of every individual. Sec. 1401(a). "Self-employment income" is defined as "the net earnings from self-employment derived by an individual * * * during any taxable year". Sec. 1402(b). "Net earnings from self-employment" is "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". Sec. 1402(a). For purposes of section 1402, "The trade or

business must be carried on by the individual, either personally or through agents or employees." Sec. 1.1402(a)-2(b), Income Tax Regs. The self-employment tax provisions are broadly construed in favor of treating income as earnings from self-employment.[8] Braddock v. Commissioner, 95 T.C. 639, 644 (1990); Hornaday v. Commissioner, 81 T.C. 830, 834 (1983); Hennen v. Commissioner, T.C. Memo. 1999-306; S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 302, 354.

Respondent does not directly dispute that petitioners retired from daily farming in 1988. Respondent contends only that petitioners engaged in a trade or business of acquiring and selling corn and corn products for profit during 1994 and 1995 and that petitioners derived the value-added payments from that trade or business.

Petitioners claim that they were not engaged in a trade or business from which they derived the value-added payments. Petitioners assert that the value-added payments constituted investment income attributable to their ownership of MCP common stock. Petitioners maintain they correctly reported the value-added payments on their 1994 and 1995 tax returns as proceeds from the sale of capital assets excludable from net earnings from

----

[8]We do not consider the provisions of subch. T of the Code, secs. 1381-1388, pertaining to the income taxation of cooperatives and their patrons, since none of the parties to this case place any reliance on those provisions.

self-employment under section 1402(a)(3).[9]  In the alternative,

petitioners argue on brief that the value-added payments are

dividends paid with respect to their MCP stock, which are

excludable from net earnings from self-employment under section

1402(a)(2).[10]

We examine the parties' contentions below, taking into

account the burden of proof, which rests upon petitioners.  Rule

142(a)(1).[11]  Respondent's determinations are presumed to be

_____

[9]Sec. 1402(a)(3) provides that, in computing a taxpayer's
net earnings from self-employment,

> (3) there shall be excluded any gain or
> loss--
> > (A) which is considered as gain or loss
> > from the sale or exchange of a capital asset,
>
> > *    *    *    *    *    *    *
>
> > (C) from the sale, exchange, involuntary
> > conversion, or other disposition or property
> > if such property is neither--
>
> > > (i) stock in trade or other
> > > property of a kind which would properly
> > > be includible in inventory if on hand at
> > > the close of the taxable year, nor
>
> > > (ii) property held primarily for sale to
> > > customers in the ordinary course of the trade
> > > or business;

[10]Sec. 1402(a)(2) provides that, in calculating a taxpayer's
net earnings from self-employment, "there shall be excluded
dividends on any share of stock".

[11]Sec. 7491 does not place the burden of proof on respondent
because the examination in this case began before July 22, 1998.
Internal Revenue Service Restructuring & Reform Act of 1998, Pub.
(continued...)

correct; petitioners must prove that respondent's determinations are erroneous in order to rebut the presumption and satisfy their burden of proof.  Id.; Welch v. Helvering, 290 U.S. 111, 115 (1933).

I.   Trade or Business

Because only gross income derived from a trade or business carried on by the taxpayer is taken into account in calculating net earnings from self-employment, we first consider whether petitioners carried on a trade or business during the years at issue.  The term "trade or business" has the same meaning for purposes of section 1402 as it has for purposes of section 162. Sec. 1402(c).  "Trade or business" under section 162 has been interpreted to mean an activity that is conducted "with continuity and regularity" and with the primary purpose of making income or a profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

Courts have sometimes struggled to differentiate a trade or business from a passive investment.  E.g., Hendrickson v. Commissioner, T.C. Memo. 1987-566 ("It is often difficult to distinguish a 'trade or business' from passive investments held for the production of income."  (citing Higgins v. Commissioner, 312 U.S. 212, 217 (1941))).  Whether a taxpayer is engaged in a

---

[11](...continued)
L. 105-206, sec. 3001(c), 112 Stat. 685, 724.

trade or business must be ascertained from a review of all the relevant facts and circumstances. Commissioner v. Groetzinger, supra ("in the absence of guidance, * * * We would defer * * * to the Code's normal focus on what we regard as a common-sense concept of what is a trade or business").

Neither party addressed directly whether petitioners' rental of their farm to the sons (rental activity), standing alone, constituted a trade or business for purposes of the self-employment tax. However, respondent appears to have accepted the proposition that income generated by petitioners' rental activity is not subject to self-employment tax, presumably because of the provisions of section 1402(a)(1).[12] Consequently, we focus our analysis on petitioners' activities with respect to MCP in order to decide whether petitioners were engaged in a trade or business

---

[12]Sec. 1402(a)(1) provides that excludable farm rental income includes rent paid in crop shares. Sec. 1.1402(a)-4, Income Tax Regs., provides:

> Rentals paid in crop shares include income derived by an owner or lessee of land under an agreement entered into with another person pursuant to which such other person undertakes to produce a crop or livestock on such land and pursuant to which (1) the crop or livestock, or the proceeds thereof, are to be divided between such owner or lessee and such other person, and (2) the share of the owner or lessee depends on the amount of the crop or livestock produced. * * *

Presumably because the sons leased petitioners' farm during 1994 and 1995 and paid petitioners a portion of what was produced on the farm as rent, respondent did not determine that the income petitioners reported as farm rental income on Form 4835 was subject to self-employment tax.

for purposes of the self-employment tax.

Petitioners originally purchased stock and units of equity participation in MCP and executed their first UMAs to enhance their ability to profit from the corn they grew on their farm. Their membership in MCP enabled them to arrange for cost-effective processing of the corn they grew and for the marketing and sale of their corn and corn products through MCP. The relationship apparently was so beneficial that, over the years, petitioners continued to buy additional units of equity participation, thereby increasing the amount of corn they would be required to produce under the UMAs but also increasing the amount of money they would be entitled to receive under the UMAs.

Although petitioners retired from daily farming in 1987 and turned over their farm operation to the sons, petitioners nevertheless continued to maintain their membership in MCP from 1987 through at least 1995. As active members of MCP during 1994 and 1995, petitioners, either directly or through the sons as their agents,[13] regularly and continuously (1) maintained their status as producers under the UMAs, (2) made decisions regarding how to satisfy their production and delivery obligations to MCP under the UMAs, (3) acquired option pool corn which they used to satisfy their production and delivery obligations to MCP several

---

[13]Petitioners testified that the sons acted on their behalf and do not dispute that the sons operated as their agents in delivering and selling corn and other produce for their benefit.

times each year, and (4) sold corn and corn products for profit through MCP.

Under the UMAs, once petitioners satisfied their production obligations by supplying corn they had either grown or acquired from the option pool to MCP, MCP processed the corn and then marketed and sold the corn and resulting products on behalf of petitioners and its other members.  In fact, the UMAs specifically appointed MCP as petitioners' agents to market and sell the corn and corn products.

Respondent argues that petitioners' involvement with MCP is more than sufficient to qualify as a trade or business. Moreover, respondent contends that MCP's actions in processing, marketing, and selling corn on behalf of its members can be attributed to petitioners for purposes of this analysis because the UMAs expressly designated MCP as petitioners' agent to market and sell the corn and corn products and because the contractual designation is controlling.

Petitioners disagree, arguing their involvement with MCP was so limited that it cannot qualify as a trade or business and that MCP's actions in processing, marketing, and selling the corn and corn products cannot be attributed to them.  Specifically, petitioners contend that whether MCP was petitioners' agent is not controlled by the UMAs but must be decided by reference to State law.  According to petitioners, the law of agency in

Minnesota requires a principal to retain some measure of control over the agent for a valid agency relationship to exist. See Jurek v. Thompson, 241 N.W.2d 788 (Minn. 1976). Petitioners claim they retained no control over the processing of the corn and the marketing and sale of the resulting corn products; therefore, MCP was acting on its own account and not as petitioners' agent. According to petitioners' analysis, unless MCP was petitioners' agent, petitioners' limited involvement in acquiring and delivering corn to satisfy their production obligations is insufficient to constitute a trade or business generating income subject to the self-employment tax.

We disagree with petitioners for several reasons. First, whether MCP qualified as petitioners' agent in processing, marketing, and selling the corn petitioners acquired and delivered to MCP in 1994 and 1995 is not essential to our holding. Regardless of whether MCP acted as petitioners' agent, the record establishes that petitioners, by satisfying their production obligations under the UMAs during 1994 and 1995, regularly and continuously purchased and sold corn with the intention of making a profit. Although petitioners may have retired from daily farming in 1987, they did not cease to function as dealers in corn following their retirement. In fact, in 1990, 1991, 1992, 1994, and 1995, petitioners bought additional units of equity participation and entered into

additional UMAs, thereby obligating themselves to produce greater quantities of corn to MCP each year.  Petitioners' argument regarding control fails to adequately acknowledge petitioners' expanding role as dealers who bought and sold corn to customers for a profit.

The second reason is grounded in the unique nature of a cooperative and its relationship to its members.  In Puget Sound Plywood, Inc. v. Commissioner, 44 T.C. 305, 306-309 (1965), we examined the nature and attributes of a cooperative in general in order to decide whether a workers cooperative association was a nonexempt cooperative association entitled to exclude patronage distributions from its gross income for Federal income tax purposes.  In so doing, we quoted the following description of a cooperative contained in 7 Ency. Am. 639 (1959):

> "A cooperative is an organization established by individuals to provide themselves with goods and services or to produce and dispose of the products of their labor.  The means of production and distribution are those owned in common and the earnings revert to the members, not on the basis of their investment in the enterprise but in proportion to their patronage or personal participation in it.  Cooperatives may be divided roughly into consumer cooperatives and producer cooperatives.
>
> *       *       *       *       *       *       *
>
> Producer [cooperative] organizations operate for the benefit of the members in their capacity as producers. Their function may be either the marketing or processing of goods produced individually (as in fishermen's or farmers' marketing associations, or associations which make butter or cheese from farm products received from farm members), or the marketing

of goods processed or produced collectively (as in the so-called workers' [cooperative] productive associations operating factories or mills)." [Emphasis supplied.]

Puget Sound Plywood, Inc. v. Commissioner, supra at 306-307. We noted that three fundamental principles underlie a cooperative: (1) Subordination of capital; (2) democratic control by the cooperative's members; and (3) the allocation among members of the economic results in proportion to the members' active participation in the cooperative endeavor. Id. at 308. Regarding the second element, we stated that a cooperative effects democratic control by requiring the members to "periodically assemble in democratically conducted meetings at which each member has one vote and one vote only, and at which no proxy voting is permitted; and these * * * [members] there deal personally with all problems affecting the conduct of the cooperative." Id.

MCP was an agricultural cooperative characterized by subordination of capital, democratic control by its members,[14] and the distribution of its operational proceeds on the basis of patronage. MCP's bylaws confirm that members had substantial control over its operations. Moreover, petitioners failed to introduce evidence to support a finding that, as cooperative

---

[14]Under MCP's articles of incorporation, each MCP member was entitled "to only one vote on each matter submitted to a vote at any meeting of the members regardless of the number of shares of common stock held by such member."

members, they could not influence MCP's operations.  Petitioners' argument that they did not have a sufficient level of control under Minnesota law to support the explicit contractual designation of MCP as petitioners' agent, even if relevant to our analysis, is unsupported by any convincing proof in the record.

Finally, petitioners have failed to convince us that Minnesota law invalidates an express contractual agency designation when both the designated agent and the designated principal adhere to the terms of the contract.  Petitioners voluntarily entered into multiple UMAs with MCP, which were in effect for 1994 and 1995.  Each of those UMAs clearly designated MCP as petitioners' agent for the marketing and sale of the corn petitioners had acquired and delivered pursuant to the UMAs.[15] There is no dispute that petitioners produced corn as required by the UMAs, or that MCP marketed and sold petitioners' corn and corn products as required by the UMAs, thereby generating the value-added payments.  Given these undisputed facts, petitioners' argument that the contractually based agency designation may be

---

[15]Petitioners also argue that, because they designated MCP as their agent for the marketing and sale of corn but not for its processing, no agency relationship was created.  This argument makes no sense and we reject it.  Petitioners appointed MCP as their agent to market and sell the corn they had acquired and delivered to MCP under the UMAs.  Whether MCP was operating as petitioners' agent in processing the corn does not control our analysis of whether petitioners were in the business of acquiring, marketing, and selling corn and corn products for profit.

disregarded under State law simply does not ring true.

Petitioners rely primarily on <u>Hansen v. Commissioner</u>, T.C. Summary Opinion 1998-91, which has no precedential value, see sec. 7463(b), and <u>Felber v. Commissioner</u>, T.C. Memo. 1992-418, affd. without published opinion 998 F.2d 1018 (8th Cir. 1993), for the proposition that the value-added payments are not subject to self-employment tax. In <u>Felber</u>, we held that a wheat farmer was not liable for self-employment tax on income received by him and generated from the sale of wheat by a tenant farmer under a crop-sharing agreement because we found that the taxpayer was retired and was only minimally involved in the production of wheat. The issue, however, was whether the exclusion from net earnings for rentals from real estate applied.[16] See sec. 1402(a)(1); sec. 1.1402(a)-4(b), Income Tax Regs. We did not address any argument that the taxpayer operated a trade or business of acquiring and selling agricultural products through the cooperative as his agent, and/or through the tenant farmer as his agent, employee, or partner.

Unlike the parties in <u>Felber v. Commissioner</u>, <u>supra</u>, the parties in this case have raised and argued issues focusing on whether petitioners, after they retired from daily farming, continued to carry on a trade or business by acquiring,

---

[16]Petitioners do not contend that the value-added payments qualify for this exclusion.

delivering, and selling corn. The facts support a conclusion that petitioners continued to acquire, market, and sell corn and corn products either directly to MCP or through MCP as their agent. Consequently, our decision in Felber simply is not applicable with respect to whether petitioners carried on a trade or business during 1994 and 1995 involving MCP. We hold that petitioners were engaged, during 1994 and 1995, in continuing and regular efforts to reap a profit from the acquisition, marketing, and sale of corn and corn products and that those efforts constituted a trade or business.

## II.  Income Derived From a Trade or Business

When faced with whether a taxpayer must treat a particular item of income as net earnings from self-employment, we have consistently stated that the taxpayer must derive the income in question from a trade or business carried on by the taxpayer. Newberry v. Commissioner, 76 T.C. 441, 444 (1981); Ray v. Commissioner, T.C. Memo. 1996-436. In other words, there must be a nexus between the trade or business and the income that the taxpayer has received. Newberry v. Commissioner, supra at 444.

We are satisfied that the value-added payments were derived from petitioners' trade or business. Petitioners, either directly or through the sons as their agents, regularly acquired and delivered option pool corn to MCP which MCP processed and then marketed and sold for petitioners. Under the UMAs, MCP was

required to make value-added payments as further consideration for the corn delivered by petitioners. The amount of value-added payments petitioners received from MCP was based on petitioners' patronage; i.e., the amount of corn acquired and delivered by petitioners to MCP during the processing year.

In Shumaker v. Commissioner, T.C. Memo. 1979-71, affd. on this issue and revd. on another ground 648 F.2d 1198 (9th Cir. 1981), we concluded without discussion that patronage distributions were subject to self-employment tax under sections 1401 and 1402. On appeal, the Court of Appeals for the Ninth Circuit affirmed our conclusion, holding that "patronage dividends from farmer's cooperatives was properly subject to self-employment tax." Shumaker v. Commissioner, 648 F.2d at 1200.

Because the value-added payments were directly related to the volume of corn acquired and delivered by petitioners to MCP and were paid in consideration for petitioners' patronage, the value-added payments had a direct nexus to petitioners' trade or business and, consequently, were derived from that trade or business. Therefore, unless the exclusion under either section 1402(a)(3) or (2) applies to the value-added payments, those payments must be included in calculating petitioners' net earnings from self-employment.

III. Exclusions Under Section 1402

A.   Introduction

Section 1402 contains several provisions which exclude specified types of income from the calculation of net earnings from self-employment.  Petitioners contend that the value-added payments are excludable under either section 1402(a)(3) or (2).

B.   Section 1402(a)(3)

Section 1402(a)(3) excludes from the calculation of net earnings from self-employment any gain or loss (1) from the sale or exchange of a capital asset, or (2) from the sale, exchange, or other disposition of property if the property is neither stock in trade or other property of a kind normally includable in inventory if on hand at the close of the taxable year nor property held primarily for sale to customers in the ordinary course of the taxpayer's trade or business.

Although their argument is not entirely clear, petitioners seem to contend that, because they acquired their MCP stock for investment purposes, the corn they acquired during 1994 and 1995 and delivered to MCP for processing, marketing, and sale was a capital asset.  Petitioners' argument is confusing and erroneous, and we reject it.

Petitioners did not sell their MCP stock.  They sold option pool corn acquired from MCP.  Petitioners' motivation in acquiring their MCP stock has no bearing on whether the option

pool corn they purchased to satisfy their production and delivery obligations under the UMAs qualifies as a capital asset. Rather, it is the character of the property sold that controls the analysis under section 1402(a)(3).

Section 1221 defines capital asset broadly as "property held by the taxpayer (whether or not connected with his trade or business)" but excludes from that definition property described in section 1221(a)(1) through (5). The exclusions include stock in trade of the taxpayer, other property of a kind normally includable in inventory if on hand at the close of the taxable year, and property held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. Sec. 1221(a)(1); see also sec. 1402(a)(3)(C).

In this case, the property sold was corn and corn products. The corn in question was acquired by petitioners to satisfy their production and delivery obligations under the UMAs so that the corn and any resulting corn products could be sold by MCP on petitioners' behalf to customers in the ordinary course of petitioners' business. The value-added payments resulted from those sales. We hold, therefore, that the value-added payments are not excludable under section 1402(a)(3) in calculating petitioners' net earnings from self-employment.

C. Section 1402(a)(2)

Petitioners alternatively argue that, if the exclusion under

section 1402(a)(3) does not apply, the exclusion under section 1402(a)(2) operates to exclude the value-added payments because those payments were really dividends paid with respect to petitioners' MCP stock.  Section 1402(a)(2) excludes from the calculation of net earnings from self-employment dividends on stock.

Ordinarily, "dividend" is a term of art used to describe a distribution of property made with respect to a shareholder's stock out of the current or accumulated earnings of a corporation, which is taxed to the shareholder as ordinary income.  See secs. 61(a)(7), 301(c), 316(a).  By its nature, a dividend paid with respect to stock is a return on a shareholder's capital investment.  In contrast, a patronage distribution[17] is a payment of a cooperative's net income calculated by reference to a member's participation in, or patronage of, the cooperative's activities.

---

[17]Patronage distributions are described by a variety of different names such as patronage dividends, patronage refunds, and value-added payments.  No matter what words are used to describe a particular distribution, the controlling characteristic appears to be whether the payment is determined by the level of a member's participation in a cooperative.  See also sec. 1388(a), which defines "patronage dividend" for purposes of subch. T as an amount paid to a patron by a qualifying cooperative on the basis of quantity or value of business done with or for that patron under a preexisting obligation of the cooperative to pay that amount, and the amount is determined by reference to the cooperative's net earnings from business done with or for its patrons.

In this case, petitioners have offered no evidence to support their alternative argument that the value-added payments were really dividends paid with respect to their MCP stock. In fact, the record contains compelling evidence against petitioners' argument. For example, MCP's articles of incorporation provided that "No dividends shall be paid on the common stock of this association" and permitted noncumulative dividends, which could not exceed a specified percentage, only with respect to MCP's preferred stock.[18] The articles also provided that "All net proceeds (savings) of this association in excess of dividends, if any, shall be distributed to patrons annually or oftener on the basis of patronage". These provisions reinforce other evidence in the record that establishes the value-added payments were paid in consideration for the quantity of business petitioners conducted with MCP. The value-added payments were calculated on the basis of the corn petitioners acquired and delivered to MCP during 1994 and 1995.

On the evidence before us, we conclude that the value-added payments were paid with respect to and as additional consideration for the corn petitioners acquired, delivered to MCP, and sold; they were not paid with respect to petitioners' MCP stock. We hold, therefore, that the value-added payments are

---

[18]Petitioners did not own any of MCP's preferred stock during the years at issue.

not excludable under section 1402(a)(2) in calculating petitioners' net earnings from self-employment.

IV. <u>Conclusion</u>

We find that petitioners were engaged in the business of acquiring, marketing, and selling corn and corn products during 1994 and 1995, and that they derived the value-added payments from that business. We hold, therefore, that the value-added payments of $132,375 and $207,612 in 1994 and 1995, respectively, reduced by petitioners' acquisition costs of $18,070 and $16,431, respectively, constitute petitioners' net earnings from self-employment under section 1402. However, because respondent did not move for an increased deficiency in this case, any deficiency determined as a result of this opinion may not exceed the deficiencies determined in the notice of deficiency.

We have considered the parties' other arguments and, to the extent not herein discussed, find them to be without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.