T.C. Memo. 2005-45

UNITED STATES TAX COURT

ERIC D. FULTZ AND SANDRA A. FULTZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4847-00.                    Filed March 10, 2005.

<u>Jon J. Jensen</u>, for petitioners.

<u>Blaine Holiday</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Petitioners petitioned the Court to
redetermine deficiencies respondent determined in their Federal
income taxes for 1994 and 1995 of $2,311 and $3,705,
respectively.  Some of the adjustments in respondent's original

determinations are no longer disputed.[1]  The issue remaining for decision is whether petitioners are liable for self-employment tax under section 1401[2] on value-added payments that Eric Fultz (Mr. Fultz) received from an agricultural cooperative.  We hold the value-added payments are subject to the self-employment tax.

FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioners, husband and wife, resided in Tracy, Minnesota, at the time their petition was filed.  During all relevant years, Mr. Fultz was a farmer and ran a farm operation involving grain and livestock.  Sandra Fultz (Mrs. Fultz) was a store manager.

1.  Fultz Farms, Inc.

Fultz Farms, Inc. (Fultz Farms), was incorporated in December 1990 by Bernard Fultz, Mr. Fultz's father.  During the years at issue, petitioners owned approximately 470 acres of farm

---

[1]Respondent has conceded an adjustment in "1.A. AG Rent-SE Income" for 1994 and 1995, along with the corollary and computational adjustments associated with that adjustment.  In addition, petitioners presented no argument nor provided any evidence with regard to adjustments "1.B. Dividends" or "1.D. Patronage Dividends" for either year and therefore have conceded those adjustments.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts are rounded.

land which they leased to Fultz Farms. Fultz Farms was involved in growing crops, such as corn and soybeans, and hog farming. The corn and grain grown on the farm also provided feed for livestock. During the years in issue, Dennis Fultz, Mr. Fultz's brother, was president of Fultz Farms, and Mr. Fultz was vice president, secretary, and treasurer of Fultz Farms. Dennis Fultz and Mr. Fultz were also directors.[3] During 1994 and 1995, Mr. Fultz owned 33 percent of Fultz Farms.

2. Minnesota Corn Processors

In approximately 1982, Minnesota Corn Processors (MCP), an agricultural cooperative, was formed under the laws of the State of Minnesota, by a group of Minnesota farmers.

MCP's goal was to collectively provide a corn processing capability to its members and to realize profits for the members based upon the increased values of that processed corn. Had MCP not been created, petitioners and other farmers would have been limited to selling their corn as raw corn, and the processing profits would have been realized by others.

MCP's articles of incorporation authorized it to issue 30,000 shares of common stock at $50 per share and 100,000 shares of nonvoting preferred stock at $50 per share. The shares of such stock could be held only by producers of agricultural

---

[3]Bernard Fultz resigned as vice president of Fultz Farms in January 1992 and as a director of Fultz Farms sometime between January 1993 and January 1994.

products "who reside in the territory served". "Producers" referred to persons "actually engaged in the production of one or more of the agricultural products handled" by MCP. Producers of agricultural products eligible for membership and having acquired a minimum of 5 shares of common stock of MCP were recognized as members.

a. Units of Equity Participation

Mr. Fultz purchased shares of stock in MCP in approximately August 1982 when MCP was first organized. Subsequently, before June 1995, Mrs. Fultz also acquired stock in MCP. Both petitioners held enough shares of MCP stock in 1995 to qualify as members of MCP. As members, they were able to purchase additional "units of equity participation" (units) in MCP. Between July 1984 and June 1992, Mr. Fultz purchased a total of 20,000 units. During the years in issue, Mr. Fultz purchased 10,000 units in June 1994 and 5,000 units in December 1995. In addition, Mr. Fultz executed a subscription agreement in January 1995 in which he agreed to pay for an additional 10,000 units with a 10-percent downpayment immediately and the remainder due in two later installments. The record does not indicate whether this transaction was completed. Mrs. Fultz purchased 2,000 units in June 1995 and 2,500 units in December 1995. Each unit represented one potential bushel of corn that the member might agree to supply to MCP.

In order to supply corn to MCP, a producer was required to hold at least 5,000 units.  Corn producers who wished to supply corn to MCP were also required annually to execute a uniform marketing agreement (UMA).  The producer was obligated to deliver to MCP the number of bushels provided in the UMA.  Although both petitioners were members of MCP, the record contains only UMAs executed by Mr. Fultz.

b.  UMAs Between MCP and Mr. Fultz

Mr. Fultz executed a UMA dated July 29, 1995, for the year 1995 and also executed a UMA for 1994, but that agreement is not a part of the record.  Collectively, the units and the UMAs defined the scope of Mr. Fultz's obligation to MCP.

Pursuant to the UMAs between Mr. Fultz and MCP, Mr. Fultz was obligated to deliver to MCP a certain amount of corn during each processing year.[4]  The UMAs outlined the terms with respect to production, processing, and marketing of the corn.  The UMAs Mr. Fultz executed in 1994 and 1995 obligated MCP to process the grain each year in a manner it deemed to be in the best interests of the cooperative and its members and to market the processed corn products at the best price that could be obtained on the open market.  Mr. Fultz was obligated to acquire and deliver the corn to MCP.  In the UMAs, Mr. Fultz appointed MCP as his agent

---

[4]MCP's processing year started on the first day of October of each year and ended on the last day of September of the following year.

in both the selling and marketing of the corn committed to MCP. In addition, MCP had "sole and complete discretion in all phases of the marketing activity". The 1994 and 1995 UMAs did not obligate Fultz Farms; only Mr. Fultz and MCP were parties to the agreements.

The UMAs specified that MCP was obligated to pay Mr. Fultz for delivered corn as follows: (1) An initial payment of 80 percent of the loan value per bushel of corn delivered within 5 days of MCP's acceptance of the corn; (2) storage and interest payments for corn delivered after October 1 of each processing year; (3) an additional payment ("value-added payment") for the value added to the corn during its processing by MCP, which was to be based on a yearend determination of MCP's "net proceeds from all of its operations" which would further compensate Mr. Fultz for his corn and still allow MCP to retain its financial integrity; and (4) patronage dividends.

Under the UMAs, Mr. Fultz was required to produce and deliver corn to MCP for processing three times a year (October through January; February through May; and June through September), giving approximately a third of the total required annual quantity at each delivery time. Mr. Fultz was free to satisfy his delivery obligations through several means. He could meet these obligations to MCP with corn that was grown on his own

farm or acquired on the open market, by hiring an outside grower, or from pool corn.

Pool corn was corn maintained by MCP and made available for members to use in order to meet their production and delivery obligations under the UMAs. A member using pool corn completed a "pool corn certificate" which required that member to check a box on the certificate requesting that the obligation be fulfilled through the pool and to charge the member's account with an acquisition fee of 5 cents per bushel or the going charge at that time for this service. Any check that was sent to Mr. Fultz in payment for delivered corn would have been offset by whatever charge he had incurred for the pool corn. The pool corn certificates were sent directly to Mr. Fultz, not Fultz Farms. If Fultz Farms fell short of corn to satisfy Mr. Fultz's obligation to MCP, on some occasions corn was purchased by Fultz Farms from a local elevator in lieu of using pool corn.

3. Petitioners' 1994 and 1995 Tax Years

a. Leases Between Petitioners and the Corporation

In 1991, Mr. Fultz executed a lease agreement with Fultz Farms. This lease remained effective in 1994 and 1995 and reflected petitioners as lessors and Fultz Farms as lessee.

The lease provided that petitioners would receive rent from Fultz Farms for a house, farm land, and MCP shares. Because of the parties' partial settlement, only the MCP shares are relevant

to this opinion.  The lease rate on MCP shares rented from petitioners was 50 cents per bushel of corn delivered to MCP. MCP was not a party to the lease arrangement, and Fultz Farms was neither a shareholder nor a member of MCP.

In 1994 and 1995, Mr. Fultz personally received value-added payments from MCP by check.  When Mr. Fultz received the checks for value-added payments from MCP in his name, he deposited the checks within a day or two, and he or Mrs. Fultz then wrote out personal checks to Fultz Farms for the same amounts.

b.  Petitioners' Member Activity With MCP

In 1994, Mr. Fultz received value-added payments from MCP of $10,590, and in 1995 he received $15,718 in value-added payments. For both years, processed corn had a higher fair market value than raw corn.

The amounts of the value-added payments had no impact on the amount petitioners were to receive under the leases.  Fultz Farms had no contractual relationship with MCP with respect to the value-added payments.  For both 1994 and 1995, Fultz Farms experienced shortfalls in the required bushels Mr. Fultz was to produce.  As a result, Mr. Fultz had to purchase 26,000 bushels of pool corn in 1994 to supplement the 9,600 bushels actually delivered and 8,403 bushels of pool corn in 1995 to supplement the 10,797 bushels actually delivered.

c.  Petitioners' Income Tax Returns and Respondent's Determinations

Petitioners timely filed their 1994 and 1995 Federal income tax returns.  With respect to self-employment tax, petitioners did not complete and attach to either return a Schedule SE, Computation of Self-Employment Tax.

Respondent made adjustments to Mr. Fultz's self-employment income of $9,618 for 1994 and $14,380 for 1995, which reflect the amounts he ultimately received from Fultz Farms per the lease related to the value-added payments, and in each year the adjustment is less than the actual value-added payments to Mr. Fultz.  We accept this as a partial concession by respondent, but our holding is based upon the original payments from MCP to Mr. Fultz, not petitioners' relationship with Fultz Farms. Respondent completed and attached to the notice of deficiency Schedules SE for Mr. Fultz's self-employment tax for the years at issue.  No self-employment tax was determined for Mrs. Fultz for 1994 or 1995.  Respondent also determined that petitioners are entitled to a deduction equal to one-half of the amount of Mr. Fultz's self-employment tax liability.

## OPINION

This case presents the question whether value-added payments Mr. Fultz received from MCP, a Minnesota agricultural cooperative, are subject to self-employment tax under section 1401(a).  Payments from MCP have previously been the subject of

decisions of this Court and the Court of Appeals for the Eighth Circuit, where an appeal of this case would lie.  In Bot v. Commissioner, 118 T.C. 138 (2002), affd. 353 F.3d 595 (8th Cir. 2003), this Court held, and the Court of Appeals affirmed, that value-added payments received by members of MCP were subject to self-employment tax, and that the self-employment income of a member of MCP includes income that the member derives from the business conducted by MCP as an agent of the member.

It has been stipulated that before the period in dispute Mr. Fultz purchased shares of stock in MCP and "units of equity participation".  Mr. Fultz entered into UMAs with MCP in which he represented he was a producer or owner of the corn he would deliver under the MCP program.  Corn was delivered to MCP to meet his obligation on his accounts to MCP, and he received value-added payments from MCP.  All these factors were present in Bot.  Nevertheless, petitioners maintain the present case should be distinguished from Bot because they entered into a lease agreement with Fultz Farms under which they purportedly assigned to Fultz Farms all their responsibilities and duties as holders of the units and all the value-added payments due from MCP.  Petitioners also assert that although Mr. Fultz received the checks representing the value-added payments from MCP, petitioners immediately wrote a check to Fultz Farms for the full amount of each check issued to Mr. Fultz by MCP.  Petitioners

maintain that once Fultz Farms was incorporated, they no longer had the assets and ability needed to grow the corn required by Mr. Fultz's equity participation in MCP. Petitioners represent that Fultz Farms assumed the obligation to produce the corn for MCP pursuant to the lease, and the payments they personally received from Fultz Farms were akin to the rent on the farm real estate paid to them by Fultz Farms. Accordingly, petitioners argue they were not subject to self-employment tax. See McNamara v. Commissioner, 236 F.3d 410 (8th Cir. 2000), revg. T.C. Memo. 1999-333.

This dispute is simply stated as whether the lease arrangement with Fultz Farms precludes the inclusion of the MCP value-added payments in Mr. Fultz's self-employment income. There are several aspects of the UMAs with MCP and the facts regarding the MCP payments that present impediments to petitioners' position.

To purchase units in MCP, the purchaser was required to own stock in MCP. Mr. Fultz owned the MCP stock; Fultz Farms did not. Mr. Fultz entered into the UMAs with MCP which appointed MCP as his agent, and he agreed to deliver the requisite quantities of corn to MCP each year. Fultz Farms was not a party to any agreement with MCP. In his agreement with MCP, Mr. Fultz

represented himself as the grower or owner of corn.  Mr. Fultz
was personally obligated to MCP and personally benefited from his
agreements with MCP through the receipt of payments from MCP.

Petitioners' position presents an argument analogous to the
taxpayers' argument in Bot v. Commissioner, supra.  The Bots
argued that their intent in purchasing the MCP equity units was
to make an investment; they reasoned that this subjective intent
prevented the application of the self-employment tax to the
proceeds received from MCP.  This Court and the Court of Appeals
for the Eighth Circuit rejected this argument.  The Court of
Appeals explained why the Bots' argument failed:

> Despite their assertions that they bought the units of
> participation as an investment, the program operated on
> the basis that they were producers or owners of the
> corn delivered under the program and that MCP acted as
> their agent in further processing and marketing the
> corn.  The Bots should be held to their
> representations.  If they want the benefits of the coop
> program, they must bear the burdens as well.  Cf.
> Estate of Bean v. Comm'r., 268 F.3d 553, 557 (8th Cir.
> 2001) ("Once chosen, the taxpayers are bound by the
> consequences of the transaction as structured, even if
> hindsight reveals a more favorable tax treatment.").

Bot v. Commissioner, 353 F.3d at 601-602.  This reasoning applies
to petitioners' assertion that they assigned their rights under
the MCP agreements to Fultz Farms because petitioners' purported
assignment did not bind MCP.  Fultz Farms did not own any stock
in MCP, was not a member of MCP, and would not have been able to
contract with MCP for the delivery of the corn.  MCP paid Mr.
Fultz, not Fultz Farms, as the grower or owner of the corn, and

MCP acted as Mr. Fultz's agent in marketing the corn. Accordingly, we find this case is controlled by <u>Bot v. Commissioner</u>, 118 T.C. 138 (2002), and thus hold the payments from MCP must be included in Mr. Fultz's income from self-employment.

In light of the foregoing, and to reflect concessions by the parties,

<u>Decision will be entered under Rule 155</u>.
