T.C. Memo. 2005-46

UNITED STATES TAX COURT

DENNIS O. FULTZ AND LINDA G. FULTZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4848-00.                    Filed March 10, 2005.

<u>Jon J. Jensen</u>, for petitioners.

<u>Blaine Holiday</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Petitioners petitioned the Court to
redetermine deficiencies respondent determined in their Federal
income taxes for 1993, 1994, and 1995 of $5,883, $9,299, and
$9,833, respectively.  Some of the adjustments in respondent's

original determinations are no longer disputed.[1]  The issue remaining for decision is whether petitioners are liable for self-employment tax under section 1401[2] on value-added payments that they received from an agricultural cooperative.  We hold the value-added payments are subject to the self-employment tax.

FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioners, husband and wife, resided in Tracy, Minnesota, at the time their petition was filed.  During all relevant years, Dennis Fultz (Mr. Fultz) was a farmer and ran a farm operation involving grain and livestock.  Linda Fultz (Mrs. Fultz) was also engaged in the farm operations in addition to running their household.

1.  Fultz Farms, Inc.

Fultz Farms, Inc. (Fultz Farms), was incorporated in December 1990 by Bernard Fultz, Mr. Fultz's father.  During the

_____

[1]Respondent has conceded an adjustment in "1.A. AG Rent-SE Income" for 1993, 1994, and 1995, along with the corollary and computational adjustments associated with that adjustment.  In addition, petitioners presented no argument nor provided any evidence with regard to adjustments "1.B. Dividends" or "1.F. Patronage Dividends" for any year and therefore have conceded those adjustments.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts are rounded.

years at issue, petitioners owned approximately 470 acres of farm land which they leased to Fultz Farms. Fultz Farms was involved in growing crops, such as corn and soybeans, and hog farming. The corn and grain grown on the farm also provided feed for livestock. During the years in issue, Mr. Fultz was president of Fultz Farms, and Eric Fultz, Mr. Fultz's brother, was vice president, secretary, and treasurer of Fultz Farms.[3] Mr. Fultz and Eric Fultz were also directors. During 1993, 1994, and 1995, Mr. Fultz owned 33 percent of Fultz Farms.

2. <u>Minnesota Corn Processors</u>

In approximately 1982, Minnesota Corn Processors (MCP), an agricultural cooperative, was formed under the laws of the State of Minnesota, by a group of Minnesota farmers.

MCP's goal was to collectively provide a corn processing capability to its members and to realize profits for the members based upon the increased values of that processed corn. Had MCP not been created, petitioners and other farmers would have been limited to selling their corn as raw corn, and the processing profits would have been realized by others.

MCP's articles of incorporation authorized it to issue 30,000 shares of common stock at $50 per share and 100,000 shares of nonvoting preferred stock at $50 per share. The shares of

---

[3]Bernard Fultz resigned as vice president of Fultz Farms in January 1992 and as a director of Fultz Farms sometime between January 1993 and January 1994.

such stock could be held only by producers of agricultural products "who reside in the territory served".  "Producers" referred to persons "actually engaged in the production of one or more of the agricultural products handled" by MCP.  Producers of agricultural products eligible for membership and having acquired a minimum of 5 shares of common stock of MCP were recognized as members.

a.  Units of Equity Participation

Mr. and Mrs. Fultz collectively purchased 30,000 shares of stock in MCP in approximately August 1982 when MCP was first organized.  Both petitioners held enough shares of MCP stock to qualify as members of MCP.  As members, they were able to purchase additional "units of equity participation" (units) in MCP.  Petitioners collectively purchased an additional 5,000 units in December 1992.  From October 1983 to December 1995, Mr. Fultz individually purchased a total of 40,000 units.  Mrs. Fultz individually purchased 65,000 units in October 1983.  Each unit represented one potential bushel of corn that the member might agree to supply to MCP.

In order to supply corn to MCP, a producer was required to hold at least 5,000 units.  Corn producers who wished to supply corn to MCP were also required annually to execute a uniform marketing agreement (UMA).  The producer was obligated to deliver

to MCP the number of bushels provided in the UMA.  Both Mr. Fultz and Mrs. Fultz executed UMAs for 1993, 1994, and 1995.

    b.  UMAs Between MCP and Petitioners

    Mr. Fultz executed UMAs dated October 18, 1993, and October 1, 1996.  Mrs. Fultz executed a UMA dated October 18, 1993.  Petitioners jointly executed UMAs dated April 14, 1982, and October 1, 1991.  Collectively, their units and the UMAs defined the scope of petitioners' obligation to MCP.

    Pursuant to the UMAs between petitioners and MCP, petitioners were obligated to deliver to MCP a certain amount of corn during each processing year.[4]  The UMAs outlined the terms with respect to production, processing, and marketing of the corn.  Specifically, the UMAs executed by petitioners obligated MCP to process the grain each year in a manner it deemed to be in the best interests of the cooperative and its members and to market the processed corn products at the best price that could be obtained on the open market.  Petitioners were obligated to acquire and deliver the corn to MCP.  In the UMAs, petitioners appointed MCP as their agent in both the selling and marketing of the corn committed to MCP.  In addition, MCP had "sole and

_____

    [4]MCP's processing year started on the first day of October of each year and ended on the last day of September of the following year.

complete discretion in all phases of the marketing activity".
The UMAs did not obligate Fultz Farms; only petitioners and MCP
were parties to the agreements.

The UMAs specified that MCP was obligated to pay petitioners
as follows:  (1) An initial payment of 80 percent of the value
per bushel of corn delivered within 5 days of MCP's acceptance of
the corn; (2) storage and interest payments for corn delivered
after October 1 of each processing year; (3) an additional
payment ("value-added payment") for the value added to the corn
during its processing by MCP, which was to be based on a yearend
determination of MCP's "net proceeds from all of its operations"
which would further compensate petitioners for their corn and
still allow MCP to retain its financial integrity; and (4)
patronage dividends.

Under the UMAs, petitioners were required to produce and
deliver corn to MCP for processing three times a year (October
through January; February through May; and June through
September), giving approximately a third of the total required
annual quantity at each delivery time.  Petitioners were free to
satisfy their delivery obligations through several means.  They
could meet these obligations to MCP with corn that was grown on
the farm or acquired on the open market, by hiring an outside
grower, or from pool corn.

Pool corn was corn maintained by MCP and made available for members to use in order to meet their production and delivery obligations under the UMAs. A member using pool corn completed a "pool corn certificate" which required that member to check a box on the certificate requesting that the obligation be fulfilled through the pool and to charge the member's account with an acquisition fee of 5 cents per bushel or the going charge at that time for this service. Any check that was sent to petitioners would have been offset by whatever charge they had incurred for the pool corn. The pool corn certificates were sent directly to petitioners, not Fultz Farms. If Fultz Farms fell short of corn to satisfy petitioners' obligation to MCP, on some occasions corn was purchased by Fultz Farms from a local elevator in lieu of using pool corn.

For 1993, there were no production shortfalls experienced by Fultz Farms in the required bushels to be produced by petitioners, and no pool corn was purchased by petitioners. For both 1994 and 1995, there were shortfalls in the required bushels petitioners were to produce, and as a result petitioners had to purchase 89,300 bushels of pool corn in 1994 to supplement the 64,191 bushels actually delivered and 28,800 bushels of pool corn to supplement the 15,300 bushels actually delivered in 1995.

For all years, processed corn had a higher fair market value than raw corn.

3. **Petitioners' 1993, 1994 and 1995 Tax Years**

a. **Leases Between Petitioners and Fultz Farms**

For 1993, 1994, and 1995, petitioners both executed separate lease agreements with Fultz Farms. These leases reflected Mr. Fultz and Mrs. Fultz in their individual capacities as lessors and Fultz Farms as lessee.

The leases collectively provided that petitioners would receive rent from Fultz Farms for a house, farm land, and MCP shares. Because of the parties' partial settlement, only the MCP shares are relevant to this opinion. The lease rate on MCP shares "rented" from petitioners was 50 cents per bushel of corn delivered to MCP. MCP was not a party to the lease arrangement, and Fultz Farms was neither a shareholder nor a member of MCP. Fultz Farms had no contractual relationship with MCP with respect to the value-added payments.

In 1993, 1994, and 1995, petitioners received value-added payments from MCP by check. MCP issued the checks to petitioners either jointly or individually. When petitioners received the checks for value-added payments from MCP in one or both of their names, they deposited the checks within a day or two, and Mr. Fultz then wrote out personal checks to Fultz Farms for the same amounts.

b.  Petitioners' Member Activity With MCP

In 1993, petitioners jointly received value-added payments from MCP of $73,813.10; for 1994 petitioners received total value-added payments of $50,302.50; for 1995 Mr. Fultz received value-added payments of $23,652.  The record for Mrs. Fultz for 1995 is incomplete, but the amount she received is not disputed by the parties.  The amounts of the value-added payments had no impact on the amounts petitioners were to receive under the leases.

c.  Petitioners' Income Tax Returns and Respondent's Determinations

Petitioners timely filed their 1993, 1994, and 1995 Federal income tax returns.  With respect to self-employment tax, petitioners completed and attached to their 1993, 1994, and 1995 Federal income tax returns Section B-Long Schedules SE, Computation of Self-Employment Tax.  Petitioners reported self-employment tax of $423, $220, and zero for 1993, 1994, and 1995, respectively.

In the notice of deficiency, respondent determined that petitioners' self-employment income from MCP was $49,500, $53,225, and $72,325 for 1993, 1994, and 1995, respectively. These amounts do not match the actual value-added payments to petitioners because respondent made adjustments based on the amount and timing of the net payments from Fultz Farms to petitioners per the lease related to the value-added payments

from MCP. The Fultz Farms payments were made after the issuance of the MCP value-added checks to petitioners. Netted across the years, respondent's adjustments appear to be lower than the amounts petitioners received from MCP. Petitioners do not contest respondent's adjustment calculations. We accept these adjustments as a partial concession by respondent. However, our holding is based upon the original payments from MCP to petitioners, not petitioners' relationship with Fultz Farms.

Respondent also made an adjustment increasing petitioners' income tax deduction equal to one-half of the amount of petitioners' self-employment tax for each of 1993, 1994, and 1995.

OPINION

This case presents the question whether value-added payments petitioners received from MCP, a Minnesota agricultural cooperative, are subject to self-employment tax under section 1401(a). Payments from MCP have previously been the subject of decisions of this Court and the Court of Appeals for the Eighth Circuit, where an appeal of this case would lie. In Bot v. Commissioner, 118 T.C. 138 (2002), affd. 353 F.3d 595 (8th Cir. 2003), this Court held and the Court of Appeals affirmed that value-added payments received by members of MCP were subject to

self-employment tax, and that the self-employment income of a member of MCP includes income that the member derives from the business conducted by MCP as an agent of the member.

It has been stipulated that before the period in dispute petitioners purchased shares of stock in MCP and "units of equity participation". Petitioners entered into UMAs with MCP in which they represented they were producers or owners of the corn they would deliver under the MCP program. Corn was delivered to MCP to meet petitioners' obligations to MCP, and they received value-added payments from MCP. All these factors were present in Bot. Nevertheless, petitioners maintain the present case should be distinguished from Bot because they entered into a lease agreement with Fultz Farms under which they purportedly assigned to Fultz Farms all their responsibilities and duties as holders of the units and all the value-added payments due from MCP. Petitioners also assert that although they received the checks representing the value-added payments from MCP, they immediately wrote a check to Fultz Farms for the full amount of each check issued to them by MCP. Petitioners maintain that once Fultz Farms was incorporated, they no longer had the assets and ability needed to grow the corn required by their equity participation in MCP. Petitioners represent that Fultz Farms assumed the obligation to produce the corn for MCP pursuant to the lease, and the payments they personally received from Fultz Farms were akin

to the rent on the farm real estate paid to them by Fultz Farms. Accordingly, petitioners argue they were not subject to self-employment tax.  See McNamara v. Commissioner, 236 F.3d 410 (8th Cir. 2000), revg. T.C. Memo. 1999-333.

This dispute is simply stated as whether the lease arrangement with Fultz Farms precludes the inclusion of the MCP value-added payments in petitioners' self-employment income. There are several aspects of the UMAs with MCP and the facts regarding the MCP payments that present impediments to petitioners' position.

To purchase units in MCP, the purchaser was required to own stock in MCP.  Petitioners owned the MCP stock; Fultz Farms did not.  Petitioners entered into UMAs with MCP that appointed MCP as their agent, and they agreed to deliver the requisite quantities of corn to MCP each year.  Fultz Farms was not a party to any agreement with MCP.  In their agreements with MCP, petitioners represented themselves as the growers or owners of corn.  Petitioners were personally obligated to MCP and personally benefited from their agreements with MCP through the receipt of payments from MCP.

Petitioners' position presents an argument analogous to the taxpayers' argument in Bot v. Commissioner, supra.  The Bots argued that their intent in purchasing the MCP equity units was to make an investment; they reasoned that this subjective intent

prevented the application of the self-employment tax to the proceeds received from MCP. This Court and the Court of Appeals for the Eighth Circuit rejected this argument. The Court of Appeals explained why the Bots' argument failed:

> Despite their assertions that they bought the units of participation as an investment, the program operated on the basis that they were producers or owners of the corn delivered under the program and that MCP acted as their agent in further processing and marketing the corn. The Bots should be held to their representations. If they want the benefits of the coop program, they must bear the burdens as well. Cf. Estate of Bean v. Comm'r., 268 F.3d 553, 557 (8th Cir. 2001) ("Once chosen, the taxpayers are bound by the consequences of the transaction as structured, even if hindsight reveals a more favorable tax treatment.").

Bot v. Commissioner, 353 F.3d at 601-602. This reasoning applies to petitioners' assertion that they assigned their rights under the MCP agreements to Fultz Farms because petitioners' purported assignment did not bind MCP. Fultz Farms did not own any stock in MCP, was not a member of MCP, and would not have been able to contract with MCP for the delivery of the corn. MCP paid petitioners, not Fultz Farms, as the growers or owners of the corn, and MCP acted as petitioners' agent in marketing the corn. Accordingly, we find this case is controlled by Bot v. Commissioner, 118 T.C. 138 (2002), and thus hold the value-added payments from MCP must be included in petitioners' income from self-employment.

In light of the foregoing, and to reflect concessions by the parties,

Decision will be

entered under Rule 155.