CHARLES DAWSON MCALLISTER AND FLORENCE MCALLISTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1365–63.   Filed August 25, 1964.

Charles Dawson McAllister, pro se.
*Eugene B. Smith,* for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax (tax on self-employment income under chapter 2 of subtitle A of the 1954 Code, as amended) for the calendar years 1958, 1959, and 1960 in the amounts of $283.50, $360, and $432, respectively.

The only issue is whether petitioners are subject to the tax on self-employment income provided for in chapter 2 of subtitle A of the 1954 Code, sections 1401 and 1402, as amended.

FINDINGS OF FACT

Petitioners are husband and wife. During the taxable years 1958, 1959, and 1960 they resided in Orlando, Fla. They filed their joint Federal income tax returns for those years with the district director of internal revenue, Jacksonville, Fla.

At all times relevant hereto petitioners were the owners of two tracts of real property. One tract of approximately 35 acres was located near the town of Winter Garden, Fla. (hereinafter sometimes referred to as tract No. 1), and one tract of approximately 65 acres was located between Orlando and Apopka, Fla. (hereinafter sometimes referred to as tract No. 2). Tract No. 1 was acquired by petitioner Florence McAllister by inheritance in 1940 or 1941 while tract No. 2 was purchased by or for the petitioners during the Second World War.

At all times relevant hereto both tracts of real property involved were planted in citrus groves and used for the purpose of growing, processing, marketing, and selling oranges and grapefruit.

During the taxable years here involved petitioner Charles Dawson McAllister was a retired colonel in the U.S. Air Force, receiving and reporting retired pay of over $7,000 per annum. Neither he nor his wife had any knowledge or experience in the production, care, and handling of citrus groves. They turned the complete management of the groves over to an old firm by the name of Karst, Inc., that had been in existence in Orlando since 1915. During the taxable years here involved, Karst, Inc., had complete charge of the maintenance of the groves which included the production, care, and raising of the

fruit. Petitioners could terminate the services of Karst, Inc., at any time they desired to do so.

Roper Growers Cooperative, hereafter sometimes referred to as Roper, is a Florida corporation with its principal place of business at Winter Garden, Fla. On June 24, 1958, petitioner Charles Dawson McAllister entered into a "Members Crop Agreement" with Roper, referred to in the agreement as "Association," for a period of 10 years. Petitioner was referred to in the agreement as "Grower." Upon execution of the agreement petitioner became a "member stockholder" of Roper. The agreement pertained to tract No. 2 and provided in part as follows:

WHEREAS, GROWER is in accord with ASSOCIATION's methods of operation and desires to take advantage of the benefits of cooperative marketing, and in so doing desires to assure to ASSOCIATION the absolute management, control and disposition of all citrus fruit crops and other agricultural products produced or controlled by GROWER,

Now, THEREFORE, in consideration of the sum of One Dollar, paid to GROWER BY ASSOCIATION, receipt whereof is acknowledged, and in further consideration of the expenses incurred by ASSOCIATION and agencies by it utilized in providing means and facilities for the handling and disposition of said fruit and other agricultural products, it is hereby agreed as follows:

1. The GROWER hereby gives and grants unto ASSOCIATION the absolute and exclusive right and authority to pick, haul, handle, grade, wash, size, process, can, pack, ship, sell and market in accordance with the rules and regulations of ASSOCIATION * * * This agreement, however, contemplates the privilege of ASSOCIATION to handle and market said fruit and other agricultural products.

2. This agreement shall be and continue in full force and effect from the date hereof for a period of ten years, with the privilege, however, to the GROWER to cancel and terminate the same by notice in writing delivered to the Secretary of the ASSOCIATION at any time within the first ten days of June in any year; * * *

*      *      *      *      *      *      *

5. That said ASSOCIATION agrees to act as agent for GROWER under the terms of this agreement and to remit promptly all money that may be due GROWER from sale of GROWER's fruit and other agricultural products, or from proceeds of any pool, after deducting the charges or assessments determined and fixed by the Board of Directors of the ASSOCIATION pursuant to the authority vested in said Board of Directors by the by-laws of the ASSOCIATION.

6. There are no oral or other conditions, promises, covenants, representations or inducements in addition to or at variance with any of the terms hereof, and this agreement represents the voluntary and clear understanding of both parties fully and completely. [Emphasis supplied.]

On December 30, 1959, substantially the same kind of agreement as the June 24, 1958, agreement was entered into between Roper and petitioner Florence McAllister pertaining to tract No. 1. This agreement was called "Members Uniform Marketing and Production Agreement" and provided, as did the June 24, 1958, agreement, that "ASSOCIATION agrees to act as agent for GROWER under the terms of this agreement * * *." (Emphasis supplied.)

Petitioners on their joint returns reported adjusted gross income as follows:

| Item | 1958 | 1959 | 1960 |
|---|---|---|---|
| Retired pay | $7,052.57 | $7,222.92 | $7,222.92 |
| Long-term capital gain | 2,000.06 | | |
| Net farm profit | 10,877.60 | 24,514.15 | 6,552.80 |
| Roper-McAllister partnership | 19,804.55 | 21,761.75 | 17,078.81 |
| Adjusted gross income | 39,734.78 | 53,498.82 | 30,854.53 |

The above-mentioned net farm profit was reported on a separate Schedule F called "Schedule of Farm Income and Expenses." This schedule showed the following income and expenses:

| Item | 1958 | 1959 | 1960 |
|---|---|---|---|
| Sales of citrus products | $25,924.80 | $43,031.72 | $35,738.95 |
| Expenses: | | | |
| Labor | 4,822.47 | 9,177.09 | 7,380.17 |
| Fertilizers, lime | 5,459.02 | 5,895.83 | 18,801.37 |
| Gasoline, fuel, oil | 131.87 | | |
| Taxes | 1,780.44 | 1,758.92 | 1,318.89 |
| Insurance | 280.08 | | |
| Automobile upkeep | 887.59 | | |
| Depreciation | 1,685.73 | 1,685.73 | 1,685.72 |
| Total expenses | 15,047.20 | 18,517.57 | 29,186.15 |
| Net farm profit | 10,877.60 | 24,514.15 | 6,552.80 |

The respondent increased the net farm profit from the amounts so reported by petitioners to $12,256.36, $25,892.91, and $13,159.05, respectively. Petitioners agreed to this adjustment and the additional tax resulting therefrom has been assessed and is not at issue in this proceeding.

In a statement attached to the deficiency notice the following appears:

NOTE: It is determined that each of you realized income from self-employment in excess of the maximum amount subject to self-employment tax. Your liability for such tax is computed below.

The deficiencies herein are due entirely to the respondent's determination that petitioners were subject to the tax on self-employment income. The respondent computed this tax for each of the years 1958, 1959, and 1960 as follows:

| Year | Computation | Tax |
|---|---|---|
| 1958 | 2×3.375% of $4,200 | $283.50 |
| 1959 | 2×3.75% of $4,800 | 360.00 |
| 1960 | 2×4.5% of $4,800 | 432.00 |

In the block asking for petitioners' occupation on their returns for 1958, 1959, and 1960, petitioners wrote "Citrus Production" for 1958, "Citrus Grower" for 1959, and for 1960 they left the block blank.

## ULTIMATE FINDINGS OF FACT

During the taxable years 1958, 1959, and 1960 petitioners themselves, or through an agent or employee, derived income from the trade or business of citrus farming in the nature of self-employment income in excess of $4,200 for 1958 and in excess of $4,800 for 1959 and 1960, and are subject to the tax on self-employment income under the provisions of section 1401 of the Internal Revenue Code of 1954, as amended.

## OPINION

Petitioners contend that they had no "self-employment income" as that term is used in section 1401 of the Internal Revenue Code of 1954[1] and defined in section 1402 and, therefore, do not owe the deficiencies determined by the respondent. These sections have been amended many times and, as amended, are in the margin.[2]

---

[1] All references to section numbers are to the Internal Revenue Code of 1954 unless otherwise indicated.

[2] Sec. 1401, as amended by sec. 202(a), Pub. L. 880 (Aug. 1, 1956), provides in part:

In addition to other taxes, there shall be imposed for each taxable year, on the *self-employment income* of every individual, a tax as follows:

(1) in the case of any taxable year beginning after December 31, 1956, and before January 1, 1960, the tax shall be equal to 3⅜ percent of the amount of the self-employment income for such taxable year; [Emphasis supplied.]

Sec. 1401 was further amended by sec. 401(a), Pub. L. 85–840 (Aug. 28, 1958), by making the tax rate 3¾ percent for the year 1959 and 4½ percent for the year 1960.

Sec. 1402 is captioned "Definitions." Subsec. (b)(1) thereof, as amended by sec. 402(a), Pub. L. 85–840 (Aug. 28, 1958), provides in part:

(b) SELF-EMPLOYMENT INCOME.—The term "self-employment income" means the *net earnings from self-employment* derived by an individual (other than a nonresident alien individual) during any taxable year; except that such term shall not include—

        *        *        *        *        *        *        *

(B) for any taxable year ending after 1954 and before 1959, (i) $4,200, minus (ii) the amount of the wages paid to such individual during the taxable year; and

(C) for any taxable year ending after 1958, (i) $4,800, minus (ii) the amount of the wages paid to such individual during the taxable year; * * * [Emphasis supplied.]

Subsec. (a)(1) of sec. 1402, as amended by sec. 201(e)(2), Pub. L. 880 (Aug. 1, 1956), provides in part:

(a) NET EARNINGS FROM SELF-EMPLOYMENT.—The term "net earnings from self-employment" means the *gross income* derived by an individual from *any trade or business carried on by such individual, less the deductions allowed by this subtitle* which are attributable to such trade or business, plus his distributive share * * * from *any trade or business carried on by a partnership of which he is a member*; except that in computing such gross income and deductions and such distributive share of partnership ordinary income or loss—

(1) *there shall be excluded rentals from real estate* * * * except that the preceding provisions of this paragraph shall not apply to any *income derived by the owner* or tenant of land if (A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural commodities * * * on such land, and that there shall be *material participation by the owner* or tenant in the production or the management of the production of such agricultural or horticultural commodities, and (B) there is *material participation by the owner* or tenant with respect to any such agricultural or horticultural commodity; [Emphasis supplied.]

Subsec. (c) of sec. 1402 provides in part:

(c) TRADE OR BUSINESS.—The term "trade or business", when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 (relating to trade or business expenses) * * *

As shown in our findings, petitioners had self-employment income in excess of $4,200 for 1958, and in excess of $4,800 for 1959 and 1960, and the respondent determined the tax here in question as being 2 times 3⅜ percent of the self-employment income for 1958, 3¾ percent for 1959, and 4½ percent for 1960.

The respondent contends that under the provisions of sections 1401 and 1402, as amended, petitioners derived self-employment income from the "trade or business" of farming and that, therefore, they are subject to the self-employment tax provided by section 1401, as amended.

On the other hand, petitioners contend that the facts and circumstances herein indicate that the arrangements petitioners had with Karst, Inc., and Roper show that the income petitioners received from the groves was in effect "rentals from real estate" and should therefore be "excluded" in determining whether petitioners had any "net earnings from self-employment" as that term is used in section 1402(a)(1), as amended. We do not agree with this contention.

Section 1.1402(a)–2(b) of the Income Tax Regulations provides in part as follows:

(b) *Trade or business carried on.* The trade or business must be carried on by the individual, either personally or through agents or employees. * * *

As far as the record shows, Karst, Inc., was no more than an employee of petitioners and in the agreements with Roper it was specifically provided that "said Association agrees to act as agent for Grower under the terms of this agreement * * *."

Petitioners' contention, that the arrangements they had with Karst, Inc., and Roper show that the income they received from the groves was in effect "rentals from real estate," has not been established and the issue must be decided against petitioners for lack of proof. The returns filed by petitioners indicate that the income petitioners received from their citrus groves was income derived from a "trade or business carried on" by petitioners and, as such, came within the definitions of "net earnings from self-employment" under section 1402(a) and "self-employment income" under section 1402(b). The "occupation" status of petitioners as reported on their returns was "citrus production" and "citrus grower" and, in the written agreements with Roper, each petitioner was referred to as "Grower." Attached to each return was a Schedule F, Schedule of Farm Income and Expenses. On Schedule F attached to each of the returns for 1958, 1959, and 1960 petitioners reported gross sales of citrus in the amounts of $25,924.80, $43,031.72, and $35,738.95, respectively. Then, under the heading of "Farm Expenses For Taxable Year," petitioners claimed deductions from gross sales for 1958, 1959, and 1960 of $15,047.20, $18,517.57, and $29,186.15, respectively.

In addition to the net farm profit reported by petitioners for 1958, 1959, and 1960 of $10,877.60, $24,514.15, and $6,552.80, respectively, petitioners reported, without any explanation, income from "Roper-McAllister partnership" of $19,804.55, $21,761.75, and $17,078.81 for 1958, 1959, and 1960, respectively.

In other words, petitioners, on their returns, have reported income and expenses from farming as being their own income and expenses for such items as labor, fertilizer, taxes, depreciation, etc.; and income from Roper as if Roper and petitioners were partners. Both types of income come within the specific definition of "net earnings from self-employment" under section 1402(a), as amended.

Clearly petitioners have failed to show what their exact arrangements with Karst, Inc., and Roper actually were. The rules and regulations of Roper were not put in evidence. Neither were we advised as to how the "money that may be due GROWER from sale of GROWER's fruit" was to be determined. In any event, we are unable to find that the income received by petitioners was in effect "rentals from real estate" to be "excluded" under section 1402(a)(1), as amended. We, therefore, sustain the respondent's determination.

Our holding here appears to be in line with the decisions of two Courts of Appeals,[3] which arose under the Social Security Act and which held that the owner of a farm who derives income from the farm *through an employee or agent* has received "earnings from self-employment" and was therefore entitled to the benefits under the Social Security Act. See also *Cresence E. Clarke*, 27 T.C. 861, where we held that the taxpayer there involved was in the trade or business of being a trustee and that the remuneration received therefrom constituted earnings from self-employment within the meaning of section 481 of the 1939 Code and was therefore subject to the self-employment tax.

*Decision will be entered for the respondent.*

---

[3] *Henderson* v. *Flemming*, 283 F. 2d 882 (C.A. 5, 1960), and *Harper* v. *Flemming*, 288 F. 2d 61 (C.A. 4, 1961).