# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

————————

No. 02-2956

————————

Richard J. Bot; Phyllis Bot,     *
    *
        Appellants,     *
    *     Appeal from the United States
    v.     *     Tax Court.
    *
Commissioner of Internal Revenue,     *        [PUBLISHED]
    *
        Appellee.     *

————————

Submitted: May 15, 2003
Filed: December 22, 2003

————————

Before MORRIS SHEPPARD ARNOLD and HANSEN, Circuit Judges, and READE,[1] District Judge.

————————

HANSEN, Circuit Judge.

Richard J. Bot and Phyllis Bot appeal from the tax court's[2] decision upholding the Internal Revenue Service's assessment of self-employment tax on the value-added payments the Bots received from the Minnesota Corn Processors Cooperative

_____

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, sitting by designation.

[2]The Honorable L. Paige Marvel, Judge, United States Tax Court.

Association ("MCP") in 1994 and 1995. The Bots argue that the tax court erred in finding that they earned the value-added payments from the carrying on of a trade or business. We agree with the tax court and affirm its judgment.

I.

The Internal Revenue Code imposes self-employment tax on the self-employment income earned by an individual, 26 U.S.C. (I.R.C.) § 1401, which is a corollary to the Federal Insurance Contributions Act, or FICA, tax paid by employers and employees to fund social security benefits. The sole issue in this case is whether the value-added payments that the Bots received from MCP were derived from a trade or business carried on by the Bots, and thus were subject to self-employment tax, or if the payments represented investment income not subject to self-employment tax.

Richard and Phyllis Bot are a married couple who filed joint tax returns for 1994 and 1995, the years at issue in this case. The Bots are retired farmers who own 700 acres of farmland in Minnesota that they have sharecropped with two of their sons since 1987, when the Bots retired from daily farming activities. The crop share agreement effective for the years at issue provided that the Bots were entitled to one-half of the crops grown on the farm.

The Bots were members of MCP at all times relevant to this appeal. They bought common stock in MCP in 1982, which stock can only be held by "producers of agricultural products," including lessors of land who receive part of the crops produced on their land as rent. (Appellants' App. at 88, Art. V § 2.) In various years since 1982, they also entered into numerous Uniform Marketing Agreements (UMA) with MCP which obligated the Bots to supply to MCP one bushel of corn for each equity unit the Bots owned. The Bots purchased the equity units at an average cost of $2.06 per unit. The UMA required MCP to market and process the corn supplied

2

under the UMAs into corn products to sell. The UMAs had a five-year rolling term, such that after the first year, the agreement was automatically renewed for an additional year, and the UMA maintained its five-year term. Upon notice of termination, the Grower was still obligated to supply corn for a period of four years following his or her notice of termination. (Id. at 107, ¶ 9.) Pursuant to a Supplement to the UMA, the Bots agreed to a pro rata change in the number of bushels they were obligated to supply depending on MCP's total corn needs. Under the UMA, the "Grower appoints and designates the Cooperative to act as Grower's sole agent in the sale and marketing of the corn committed to the Cooperative under this Agreement." (Id. at 104, ¶ 1.) Members satisfied their obligation to supply corn to MCP with corn grown by the member, corn purchased by the member on the open market, or through MCP's "option pool corn," which is corn MCP buys on the open market and makes available to members to use to meet their delivery obligations. If option pool corn was used, the grower paid MCP $.05 per bushel as a service fee and MCP retained title to the corn. Regardless of the source of the corn, the grower warranted in the UMA that he or she was the producer or owner of the corn. (Id. at 107.)

MCP paid the members under the UMA as follows: (1) an initial payment of at least 80% of the loan value of the non-option pool corn on delivery; (2) storage and interest fees for corn required to be delivered after October 1; (3) a value-added payment, which is "such payment [from MCP's net operating proceeds] . . . which will further compensate Grower for Grower's corn and still allow [MCP] to retain its financial integrity" (Appellants' App. at 106); and (4) patronage dividends. Because the Bots used only option pool corn to meet their UMA obligations, the only payments they received from MCP were the value-added payments and the separately determined patronage dividends. The Bots reported the patronage dividends on Form 4835, Farm Rental Income and Expenses, along with the income earned under the crop share agreement with their sons, which the Internal Revenue Service ("IRS") does not dispute. Only the value-added payments received by the Bots from MCP are at issue in this case.

3

As indicated above, the Bots entered the first UMA in 1982 and always satisfied their obligation to supply corn to MCP with option pool corn. In 1994, the Bots held 250,000 active equity units, for which they had paid $515,000. In 1995, the Bots held 395,000 active units, at a total cost of $813,700. They delivered 325,000 bushels in 1994 (130% of the number of their equity units) and 379,200 bushels in 1995 (96% of the number of their equity units) from MCP's option pool corn. They received $132,375 and $249,152 in 1994 and 1995, respectively, as value-added payments. They reported those receipts as gross proceeds from the sale of capital assets on Schedule D of their 1994 and 1995 tax returns. They reported their basis in the assets as $68,070 in 1994 and $86,431 in 1995. The bases were derived from the $.05 handling fee paid to MCP to use the option pool corn to meet their obligations ($18,070 in 1994 and $16,431 in 1995) plus payments the Bots made to their sons for their half of the seed, fertilizer, and weed spray as required by the crop share agreement ($50,000 in 1994 and $70,000 in 1995).[3] The Bots separately reported their income from the crop share agreement on Form 4835 (Farm Rental Income and Expense), which income is not at issue in this appeal.

On audit, the IRS determined that the Bots were in the trade or business of producing, marketing, processing, and selling corn and that the value-added payments should be reported on Schedule C instead of Schedule D, thus subjecting the payments, less any allowable deductions, to self-employment tax. The IRS simply moved the net income from Schedule D to Schedule C, allowing the Bots to deduct the claimed bases for each year as expenses against the value-added payments received to arrive at net income subject to self-employment tax.

---

[3]The parties agree that the $50,000 and $70,000 payments to the Bots' sons were not really attributable to the corn supplied to MCP under the UMA obligations, though no adjustments were made in the audit to correct the discrepancy.

Upon appeal of the assessment, the Bots argued to the tax court that the value-added payments represented investment income on their shares held in the MCP cooperative, not income from a trade or business subject to self-employment tax. The tax court determined that the Bots' activities of regularly and continuously acquiring and selling corn and corn products through the MCP with the intent of making a profit qualified as engaging in the trade or business of dealing and processing corn, even though they retired from daily farming activities in 1987. The court also relied on the unique nature of the relationship between a cooperative and its members to find that the Bots engaged in the trade of dealing in corn through MCP acting as their agent. The court found a direct nexus between the Bots' trade of dealing corn and the value-added payments because the value-added payments were distributed based on the number of bushels of corn delivered to MCP by the Bots. The Bots appeal.

II.

We review the tax court's legal conclusions de novo and its fact-findings for clear error. The Bots have the burden of establishing that the IRS's characterization of the value-added payments as self-employment income is erroneous. See Campbell v. Comm'r, 164 F.3d 1140, 1142 (8th Cir.), cert. denied, 526 U.S. 1117 (1999).

The Internal Revenue Code imposes self-employment tax on the "net earnings from self-employment derived by an individual." §§ 1401(a), 1402(b). The term "net earnings from self-employment" is defined as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed." § 1402(a). The term "trade or business" is defined only by reference to I.R.C. § 162 (relating to trade or business expenses), see § 1402(c), but is not otherwise defined in either section 162 or section 1402. "Self-employment income is determined by the source of the income, not the taxpayer's status at the time the income is realized." Schelble v. Comm'r, 130 F.3d 1388, 1392 (10th Cir. 1997) (internal quotations omitted). The "derived from" requirement necessitates a nexus

5

between the income and the trade or business actually carried on by the taxpayer. That is, the trade or business activity must give rise to the income. Milligan v. Comm'r, 38 F.3d 1094, 1098 (9th Cir. 1994). Treasury regulations provide that the "trade or business must be carried on by the individual, either personally or through agents or employees." Treas. Reg. § 1.1402(a)-2(b). Thus, the value-added payments are self-employment income if they: 1) are derived 2) from a trade or business 3) carried on by the Bots or their agents. The self-employment tax provisions are broadly construed to favor treatment of income as earnings from self-employment. See Braddock v. Comm'r, 95 T.C. 639, 644 (1990); Hornaday v. Comm'r, 81 T.C. 830, 834 (1983); see also Comm'r v. Groetzinger, 480 U.S. 23, 31 (1987) (discussing the meaning of a "trade or business" and concluding that the "statutory words are broad and comprehensive").

On their tax returns, the Bots claimed that the value-added payments constituted gain from the sale of capital assets. They have abandoned that theory on appeal and argue that the payments were the result of passive investment, similar to dividends, rather than from the carrying on of a trade or business. Whether a taxpayer is engaged in a trade or business–an inquiry depending on the specific facts of each case–is a question of fact subject to review under the clearly erroneous standard. Cent. States, S.E. & S.W. Areas Pension Fund v. Neiman, 285 F.3d 587, 593-94 (7th Cir. 2002). "[T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and . . . the taxpayer's primary purpose for engaging in the activity must be for income or profit." Groetzinger, 480 U.S. at 35 (holding that a full-time gambler was engaged in a trade or business).

As did the tax court, we believe the unique nature of the relationship between a cooperative and it members plays a significant role in deciding this case. The Bots analogize to corporate dividends in arguing that the value-added payments are the result of a passive investment rather than earnings from a trade or business. Their

choice to "invest" in a cooperative, as opposed to a corporation, however, is fatal to their argument.

> A cooperative is an organization established by individuals to . . . produce and dispose of the products of their labor. The means of production and distribution are those owned in common and the earnings revert to the members, not on the basis of their investment in the enterprise but in proportion to their patronage or personal participation in it.

Puget Sound Plywood, Inc. v. Comm'r, 44 T.C. 305, 306 (1965) (internal quotations omitted).

By contrast, the Supreme Court has explained why "[d]evoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." Whipple v. Comm'r, 373 U.S. 193, 202 (1963).

> Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation.

Id. Thus, a cooperative is dissimilar to a corporation, which is a wholly separate entity from its shareholders.

Also distinguishing the value-added payments from passive investment income is the fact that the payments did not depend on how many shares of stock or equity

7

units the Bots held, but on the quantity of corn they supplied to MCP to be processed. This distinguishes the Bots' situation from cases like Hendrickson v. Comm'r, which involved owners of working interests in gas wells who received income based on their share of interest in the well. See 54 T.C.M. (CCH) 1079 (1987) (holding that an owner of a working interest in a gas well, who farmed out his responsibilities to manage the operation of the gas well because he lacked any experience in the field, and who owned a minority interest in the well, was a passive investor not subject to self-employment tax). Value-added payments are tied to the quantity of corn delivered, not the number of shares or equity units held. The Bots were required to do more than hold the stock or equity units; they had to supply corn to MCP before they were entitled to receive the value-added payments. We reject the Bots' attempt to equate the value-added payments to corporate dividends.

Having rejected the Bots' argument that the value-added payments were the result of a passive investment, we turn to the determination of whether the payments derived from a trade or business carried on by the Bots or their agent. We must understand the nature of the value-added payment to assess whether there is a nexus between it and a trade or business carried on by the Bots. The value-added payment represented "an additional payment from the value added to the corn [supplied pursuant to the UMA] during its processing by the Cooperative . . . which will further compensate Grower for Grower's corn." (Appellants' App. at 106.) The gain was passed on to the members in proportion to the amount of corn supplied by the members. The Bots received the value-added payments as consideration for fulfilling their obligation to deliver a specified number of bushels of corn to MCP to be processed into corn products, marketed, and sold. This consideration provides the required nexus between the value-added payment and the trade or business of supplying corn to be processed.

The Bots argue that the value-added payments really derived from the work performed by MCP in processing the corn, not from work performed by them in

8

merely supplying the corn. They further argue that because they had no control over MCP's actions regarding the corn supplied under the UMA, an element they argue is necessary for establishing an agency relationship under Minnesota law, MCP was not their agent and MCP's trade or business of processing corn could not be attributed to them, despite their express designation of MCP as their agent in the UMA. Again, we find the peculiar traits of the cooperative/member relationship determinative. "It is generally recognized that a cooperative marketing agreement may give rise to either of two relationships with respect to the products marketed thereunder–that is, it may be a contract of sale, or it may create the relationship of principal and agent between the member and the association." 18 Am.Jur.2d Cooperative Associations § 39. The Supreme Court of Minnesota has recognized these alternative relationships, looking to the statute under which the cooperative is organized and the parties' agreement to determine which relationship a particular cooperative shares with its members. See Elliott v. Adeckes, 59 N.W.2d 894, 898 (Minn. 1953) (noting that it is clear that Minnesota cooperative statutes allow a cooperative to either engage in a pooling operation, under which the cooperative acts on behalf of its members, or to purchase product outright from its members); Minn. Wheat Growers' Coop. Mktg. Ass'n v. Huggins, 203 N.W. 420, 422 (Minn. 1925) (noting that a farmers' cooperative "is merely a selling agency" for its members).

Looking to the facts surrounding the Bots' relationship with MCP, we agree with the tax court that MCP acted as the Bots' agent. The Minnesota statutes that authorize cooperative associations recognize that cooperatives act as agents for their members. See, e.g., Minn. St. § 308A.201(1) ("[A] cooperative as an agent or otherwise: (1) may perform every act and thing necessary or proper to the conduct of the cooperative's business . . . .") (emphasis added). Further, the UMA between the Bots and MCP clearly indicates that MCP was acting as the Bots' agent. The UMA specifically designated MCP as the "Grower's sole agent in the sale and marketing of the corn committed to the Cooperative under this Agreement." (Appellants' App. at 104.) The Bots agreed to "commit and deliver" corn to MCP for marketing and

processing (id.), but the agreement never intimates a sale of corn to MCP. In fact, the agreement is careful to refer to the corn as corn "delivered" to MCP, not sold to MCP. The initial payment could be as low as 80% of the loan value of the corn supplied (id. at 105), revealing that the initial payment was not a purchase of the corn at current market value, but an advance to the member. The agreement describes the value-added payment as "further compensat[ion] for Grower's corn." (Id. at 106.) Even though the UMA gave MCP "sole and complete discretion in all phases of the marketing activity" (id.), MCP was still obligated to process the corn in a manner that served the best interests of the growers as a whole and to market the processed products at the best price obtainable under market conditions. (Id.) We agree with the tax court that MCP acted as the Bots' agent in processing and selling corn and corn products under the UMA. See McAllister v. Comm'r, 42 T.C. 948, 949 (1964) (relying on cooperative agreement's designation of taxpayer as "grower" and cooperative as "grower's agent" in holding that income received from cooperative was self-employment income, despite agreement giving cooperative "absolute management, control and disposition of all citrus crops").

Finally, the Bots argue that their intent to purchase the equity units as an investment rather than as a business should be determinative. The Bots testified that they joined MCP as an investment and did nothing more than check a box stating that they wanted to pay $.05 per bushel to use MCP's option pool corn to satisfy their obligation to deliver corn. To be eligible to be a member of MCP and to purchase the units of equity participation, however, the Bots warranted to MCP that they were "producers of agricultural products," which included lessors under a crop share agreement who received a share of the crops produced on the farm (Appellants' App. at 88), and that they were "the producer or owner of the corn delivered." (Id. at 107.) Despite their assertions that they bought the units of participation as an investment, the program operated on the basis that they were producers or owners of the corn delivered under the program and that MCP acted as their agent in further processing and marketing the corn. The Bots should be held to their representations. If they

10

want the benefits of the coop program, they must bear the burdens as well. Cf. Estate of Bean v. Comm'r, 268 F.3d 553, 557 (8th Cir. 2001) ("Once chosen, the taxpayers are bound by the consequences of the transaction as structured, even if hindsight reveals a more favorable tax treatment.").

## III.

The tax court's judgment is affirmed.

_____